### In re INTERNATIONAL CHEMICAL WORKERS UNION, et al.

#### No. 89–1357.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 13, 1989.

Decided March 20, 1992.

---

David C. Vladeck, Katherine A. Meyer, Public Citizen Litigation Group, Washington, D.C., for petitioner appellant.

Barbara Werthman, Ann Rosenthal, Cynthia L. Att, Dept. of Labor, Washington, D.C., for appellee respondent.

Before WALD, RUTH BADER GINSBURG, and SILBERMAN, Circuit Judges.

Opinion for the Court filed PER CURIAM.

PETITION FOR WRIT OF MANDAMUS

PER CURIAM:

I.

Six years ago, petitioners International Chemical Workers Union and Public Citizen Litigation Group filed a rulemaking petition with OSHA requesting it to issue immediately an Emergency Temporary Standard ("ETS") under section 6(c) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 655(c) (1988), for occupational exposure to cadmium. *See* Petition (dated June 18, 1986). Petitioners asserted that

> [i]n light of the new human evidence on lung cancer, it is clear that the present OSHA standard is grossly inadequate, and there is absolutely no justification for further regulatory delay. Since no exposure to a carcinogen is considered to be safe, OSHA must regulate cadmium as a carcinogen and set as low a standard as possible.

*Id.* at 3.[1]

---

1. Cadmium is a soft, blue-white metal or gray powder that is obtained as a by-product from the refinement of zinc and other metals. It has many industrial uses, ranging from rust protection to pigmentation. Workers in lead and zinc smelters, as well as those in electroplating and welding, all face potentially high exposures to cadmium.

In October 1986 and again in February 1987, petitioners inquired of OSHA about the status of their petition. After a full year had passed, petitioners filed in June 1987 for a writ of mandamus in this court to compel OSHA to take emergency action to protect workers from exposure to cadmium. One week later, on July 1, 1987, OSHA finally responded to petitioners' request. *See* Letter from OSHA to Petitioners (dated July 1, 1987) ("OSHA's July 1987 Response"). Although OSHA agreed that "there is clear evidence that exposure to cadmium can result in irreversible damage to the kidneys," the agency nonetheless refused to issue an ETS:

> [B]ased on our analysis of your petition and the underlying data, OSHA finds that the currently available data are not sufficiently definitive in certain critical areas to support the need for an ETS, particularly in light of the extremely stringent statutory criteria for issuing and sustaining such an action.

*Id.* at 2. Even though it denied petitioners' request to proceed under section 6(c), OSHA admitted that "there is a need to embark promptly on further rulemaking" under the traditional section 6(b) procedures. *Id.* at 5.

In light of OSHA's announcement of its intention promptly to initiate rulemaking, this court treated the mandamus petition as one for review of OSHA's denial of an ETS, *In re International Chemical Workers Union*, 830 F.2d 369, 370 (D.C.Cir.1987) (per curiam). It denied the petition, concluding that OSHA is entitled to "great deference" in its assessment of scientifically complex facts and in its "balancing of the competing policies that underlie the decision whether to issue an ETS." *Id.* at 371.

OSHA stated at that time that "[w]e anticipate that a Notice of Proposed Rulemaking will be published in the *Federal Register* in December 1987. We anticipate the publication of a final standard 18 months after publication of the proposal," *i.e.*, in June 1989. OSHA's July 1987 Response at 2. After OSHA had missed its December 1987 timetable for proposing a rule, petitioners warned that

> [i]n light of the magnitude of this risk, we cannot stand by while OSHA persists in foot-dragging. Unless we are promptly assured that OSHA intends to expedite the cadmium rulemaking, and are provided realistic milestones with which we can chart the agency's progress, we will be compelled to once again take legal action to force the agency to move expeditiously in this rulemaking.

Letter from Petitioners to OSHA (dated June 29, 1988) at 2. OSHA responded that "[i]t is the Agency's intention to move as quickly as possible to establish a standard for cadmium" and that the proposed rule would be published "in late summer or early fall" of 1988. *See* Letter from OSHA to Petitioners (dated Aug. 10, 1988). At this point, OSHA was lagging almost a year behind its original rulemaking schedule.

In September 1988, OSHA issued guidelines to employers who produce or use cadmium to alert them to the inadequacy of OSHA's current exposure standards. *See* OSHA, U.S. Dep't of Labor, *Protective Measures for Controlling Exposure to Cadmium* (1988). These guidelines, however, were unenforceable and were intended to serve only as an interim measure, pending the adoption of a final rule. Two months later, in November 1988, OSHA informally circulated a draft proposed standard to members of the Construction Ad-

It is undisputed in this record that cadmium is extremely dangerous. OSHA's 1971 permissible exposure limit of 100 micrograms per cubic meter of air ($\mu g/m^3$) was set as an interim level reflecting minimum health and safety standards at the time. This level is still the standard, despite numerous epidemiological studies that have demonstrated that exposure to levels well below 100 $\mu g/m^3$ causes kidney failure as well as lung and prostrate cancer. Although the parties disagree about the precise risk estimates associated with cadmium exposure at different levels, "[t]here is an abundance of data for several adverse health effects, clearly indicating that exposures to cadmium in the industrial environment can cause serious toxic effects in human beings." 55 Fed.Reg. 4052, 4065 (1990). OSHA's proposal would ensure that no worker is exposed to an airborne concentration in excess of 5 $\mu g/m^3$, calculated as an eight-hour time weighted average exposure.

visory Committee and held a public meeting. However, OSHA never published the proposed rule in 1988 as its altered schedule had promised.

Seven months more went by without a proposed rule, and petitioners once again wrote to respondents, expressing their "deep and long-standing concern that [OSHA] has unreasonably delayed adoption of a new standard to protect workers from the devastating health effects" attributable to cadmium exposure. Letter from Petitioners to Secretary of Labor (dated Mar. 21, 1989) at 1. In its reply, OSHA proposed still another postponement:

> It is anticipated that the earliest a proposed standard could be published would be in the fall of this year [1989]. If the rulemaking then proceeds routinely, it is likely to take until June 1991 to complete the Final standard. While OSHA has not met the schedule previously proposed, OSHA staff has worked diligently to expedite the development of this standard, which involved complex issues.

Letter from OSHA to Petitioners (dated Apr. 18, 1989) at 1. This revised schedule was now two years behind that which OSHA originally proposed to the court at the time of petitioners' request for an ETS.

In June 1989, petitioners petitioned this court for a writ of mandamus to compel OSHA to issue a proposed cadmium standard within one month and a final rule within one year. OSHA opposed any imposition of deadlines, representing to the court that it intended to produce a final cadmium standard within 18 months of publication of the proposal. On October 6, 1989, OSHA informed this court that after submitting a Notice of Proposed Rulemaking to the Office of Management and Budget ("OMB"), discussions between the Department of Labor and OMB were proceeding on an expedited basis. After oral argument, this court issued an order concluding that it is "reasonable to estimate that OMB should be able to complete its review of the proposed cadmium rule within three months of the date of this order" and that, by the end of the three-month period, OSHA should "file a report with the court indicating the status of the proposed rule and the date by which the agency expects to issue a final cadmium rule." Order (filed Oct. 20, 1989).

On January 22, 1990, respondents filed the required status report. They stated that OMB had completed its review of the proposed rule on January 19 and that OSHA would deliver it to the *Federal Register* on January 25. OSHA also argued that "[i]f this Court does set a date for issuance of a final rule, OSHA suggests the agency be allowed 18 *to 24* months from publication of the proposed rule." Secretary of Labor's Status Report (filed Jan. 22, 1990) at 2 (emphasis added). Petitioners objected that OSHA was now stating for the first time that it would require 24 months, not 18, from notice of the proposed rule to the completion of the rulemaking. Under OSHA's new timetable, the issuance date was pushed forward to 1992.

The proposed rule was published in the *Federal Register* on February 6, 1990. *See* 55 Fed.Reg. 4052 (1990) (to be codified at 29 C.F.R. pt. 1910). In a subsequent order, we stated that "[w]e are satisfied with OSHA's compliance to this point, but note that OSHA's current projection of a 24–month period from the date of publication of the proposed rule to the publication of a final rule exceeds by six months the 18–month period it projected in its brief, which was filed several months ago." Order (filed Feb. 12, 1990) at 1–2. The court continued to retain jurisdiction over the case and ordered OSHA to submit a status report every six months until a final rule was published.

Over the next two years, respondents filed three status reports: On August 13, 1990 (reporting that public hearings were held in June and July, 1990); February 12, 1991 (reporting that the comment period had closed on October 18, 1990 and that the OSHA staff is "well underway in the process of reviewing and analyzing the record" of hearings and submissions); and on August 12, 1991 (reporting that "preliminary drafts of significant portions of the text of the standard and of the accompanying preamble" have been completed and that OSHA anticipated reopening the

record for the limited purpose of soliciting comments on new information concerning carcinogenicity of certain cadmium compounds).

Respondents' latest status report was filed on February 12, 1992 and reported, disappointingly, that "despite the progress to date, OSHA was unable to promulgate the final standard within 24 months of the proposal as projected." Secretary of Labor's Status Report (filed Feb. 12, 1992) ("1992 Status Report") at 2. Respondents predicted that the final rule would not be published until August 31, 1992. *Id.*

Respondents gave three reasons for this latest delay in the issuance of the final rule beyond the original 24 month period. First, the OSHA staff member responsible for producing the final risk assessment resigned unexpectedly in the fall of 1991 before completing it. "[A] significant amount of time was required to familiarize the contractor with the complex issues and data base involved and to discuss and evaluate appropriate risk methodologies." *Id.*

Second, the "development of the standard's medical surveillance requirements has proven more time consuming than anticipated." *Id.* Specifically, respondents represent that they have nearly completed only the "first draft" of the guidelines for protocols measuring Beta 2 microglobulin and cadmium levels in the blood. "To assess the feasibility of the biological monitoring requirements and assure the accuracy and reliability of laboratory analysis of monitoring results, OSHA had to contract out and oversee the development of appropriate guidelines." *Id.* at 3.

Third, as reported in the August 1991 status report, OSHA did briefly reopen the rulemaking record to receive the final reports of two recent studies on cadmium sulfide, as well as updated assessments by outside experts on these reports and public comments concerning cadmium sulfide generally and late-filed evidence submitted on certain other issues. *See* 56 Fed.Reg. 47,-348–49 (1991). OSHA says it received more substantive comments on these other issues than it had anticipated and that "[s]ubstantial additional staff time is required to analyze and respond to the issues raised, delaying the drafting of portions of the final rule relating to the health effects of exposure to cadmium, including cadmium sulfide." 1992 Status Report at 4.

Finally, respondents predict that the August 31, 1992 date will provide time that is "absolutely necessary for completion of its statutorily mandated findings and conclusions concerning risk, benefit and feasibility in light of developments wholly beyond OSHA's control." *Id.* They acknowledge "the need to complete this rulemaking expeditiously and the current timetable reflects no lowering of the priority assigned to this project." *Id.*

## II.

In light of this chronology, petitioners have renewed their motion to us to impose a definitive deadline for completion of the cadmium rulemaking. Petitioners do not oppose the seven month "extension of time"—from February 6, 1992 to August 31, 1992—that OSHA gives as its best estimate for completion of the rulemaking, but they "are adamant about the need for a court ordered deadline." *Id.* at 9. They insist that respondents' track record in meeting scheduling deadlines in the absence of a court order has been "dismal," *id.;* that the protracted delays exact too high a toll on exposed workers' health given the undisputed health risks of cadmium, *id.* at 10; and that the cumulative delay—extending over six years, from the time they requested an ETS—is so egregious as to demand the court's intervention to enforce as a deadline a termination date that the agency now agrees is reasonable and feasible, *id.* at 11; *see Public Citizen Health Research Group v. Brock*, 823 F.2d 626 (D.C.Cir.1987) (per curiam) (ordering OSHA, after delay of six years, to adhere to schedule and warning that failure to comply with timetable may expose OSHA to contempt); *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1157 (D.C.Cir.1983) (per curiam) (ordering OSHA to issue a notice of proposed rulemaking within 30 days after a delay of only *three* years).

OSHA, however, opposes petitioners' motion, stressing that the additional seven-month period is necessary because "[t]he events in the late stages of this rulemaking, outlined in the February status report, could not have been anticipated or accounted for in OSHA's 1989 planning," Secretary's Response (filed Feb. 27, 1992) at 3 n. 1, and "[t]hough some slippage in the previous schedule has occurred, that does not demonstrate the need for judicial intervention,". *id.* at 5. Respondents insist that "[t]o issue a writ of mandamus on such a record ... is to lower the threshold for mandamus to the point where the writ loses meaning and OSHA loses necessary freedom of judgment." *Id.* at 7.

### III.

■ OSHA's rulemaking determinations are "essentially legislative and rooted in inferences from complex scientific and factual data," *United Steelworkers of Am. v. Marshall,* 647 F.2d 1189, 1206 (D.C.Cir. 1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 3149, 69 L.Ed.2d 997 (1981), and, accordingly, they are entitled to great deference, *see Auchter,* 702 F.2d at 1156; *see also In re Barr Labs.,* 930 F.2d 72, 74 (D.C.Cir.) ("respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities"), *cert. denied,* — U.S. —, 112 S.Ct. 297, 116 L.Ed.2d 241 (1991). This court rarely reviews nonfinal agency action, preferring instead to review a factual record developed by the agency through the application of its expertise. *See Telecommunications Research & Action Ctr. v. FCC,* 750 F.2d 70, 79 (D.C.Cir.1984) (*"TRAC"*).

■ Nevertheless, in extraordinary circumstances, this court will review claims of unreasonable agency delay, for "[i]t is obvious that the benefits of agency expertise and creation of a record will not be realized if the agency never takes action." *Id.* Furthermore, the Administrative Procedure Act requires that an agency "proceed to conclude a matter presented to it" and that it do so "within a reasonable time." 5

U.S.C. § 555(b) (1988). A reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1); *see also TRAC,* 750 F.2d at 77 ("section 706(a) coupled with section 555(b) does indicate a congressional view that agencies should act within reasonable time frames and that court's [sic] designated by statute to review agency actions may play an important role in compelling agency action that has been improperly withheld or unreasonably delayed").

■ According to the law of the Circuit, a court must assess several factors in order to determine whether an agency's delay is "unreasonable." First, "the court should ascertain the length of time that has elapsed since the agency came under a duty to act," *Cutler v. Hayes,* 818 F.2d 879, 897 (D.C.Cir.1987). Although there is no *per se* rule as to how long is too long, "inordinate agency delay would frustrate congressional intent by forcing a breakdown of regulatory processes." *Id.* at 897 n. 156. Second, "the reasonableness of the delay must be judged 'in the context of the statute' which authorizes the agency's action." *Auchter,* 702 F.2d at 1158 n. 30 (quoting *National Congress of Hispanic Am. Citizens v. Marshall,* 626 F.2d 882, 888 (D.C.Cir.1979)). Congress has declared that the purpose and policy of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678 (1988), is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." *Id.* § 651(b).

Third, the court must examine the consequences of the agency's delay. *Cutler,* 818 F.2d at 898. "Delays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." *Auchter,* 702 F.2d at 1157.

Finally, the court should give due consideration in the balance to "any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *Cutler,* 818 F.2d at 898; *see also In re Barr Labs.,* 930 F.2d at 75; *TRAC,* 750 F.2d at 80 ("the

court should consider the effect of expediting delayed action on agency activities of a higher or competing priority"). In this case, OSHA has cited to the resignation of a key staff member, the unanticipated delay in developing medical surveillance guidelines, and the need to respond to additional comments as contributing to the latest seven-month postponement. Furthermore, OSHA has argued that it "did not have unlimited resources with which to address these problems" because of deadlines imposed by Congress with respect to other rulemaking proceedings. *See* 1992 Status Report at 4 n. 2.

It is OSHA itself, however, which has suggested August 31, 1992 as the date on which it can complete the rulemaking. "Although we are disappointed with this target date," *Brock*, 823 F.2d at 629, we accede on balance to OSHA's plea for additional time. But even if finally completed by August 31, 1992, the cadmium rulemaking will have taken over six years. This is an extraordinarily long time, in light of the admittedly serious health risks associated with the current permissible levels of cadmium exposure under the twenty-year-old standards still in place. Whether the delays at every stage are the result of the agency's "persistent excess of optimism," *Brock*, 823 F.2d at 629, or attributable to bureaucratic inefficiencies, *id.* at 628, there must be an end to the process sometime soon. Under the circumstances, we do not see how any further delay beyond August 31, 1992—resulting in continued exposure of workers to dangerous levels of cadmium—could be excusable. *See* 55 Fed.Reg. 4052, 4084–85 (1990) (cadmium exposure even at levels below the 100 $\mu$g/m$^3$ current standard may lead to kidney dysfunction, reduced pulmonary function, chronic lung disease, and cancer).

The agency is now in the concluding phase of the rulemaking; it predicts final issuance of a rule in five months from now. It is hard to conceive of why that date cannot be met. Yet for three years, OSHA has not met any timetable proposed to the court, and we have grave cause for concern that if we do not insist on a deadline now, some new impediment will be pleaded five months hence. OSHA's asserted justifications for the delay become less persuasive the longer the delay continues.

There is a point when the court must "let the agency know, in no uncertain terms, that enough is enough," *Brock*, 823 F.2d at 627, and we believe that point has been reached. We are not unmindful of OSHA's need to "juggle competing rulemaking demands on its limited scientific and legal staff," *id.* at 623, but we think the delay in promulgating a final rule that OSHA believes is necessary to workers' well-being has been too lengthy for us to temporize any longer. We accept OSHA's estimate of the additional time it needs to complete the final stages of the rulemaking, but we insist that there be no postponement beyond the August 31, 1992 target date. Any additional delay would violate this court's order.

### IV.

Petitioners' Motion to Impose a Deadline for Completion of the Cadmium Rulemaking is granted, and respondents are ordered to issue a final rule by August 31, 1992.

*It is so ordered.*