The Honorable Robert L. McGinnis State Representative 81 Highway 316 Marianna, Arkansas 72360
Dear Representative McGinnis:
This is in response to your request for an opinion on whether Act 1206 of 1995 (the "Act") requires the State Employee/Public School Personnel Insurance Board (the "Board") to offer to public school employees, for the 1995-96 school year, all HMO products, having a point of service option, of insurers who wish to participate ("designated HMOs"), or whether the Board may defer offering designated HMOs until the 1996-97 school year.
As noted in your request, this office recently issued Op. Att'y Gen.95-126, which concluded that the Act requires the Board to offer all eligible HMOs to state and public school employees, but did not address in any way the timing of such offering. You state your belief that my conclusion in Op. Att'y Gen. 95-126 is in accord with the legislative intent underlying the Act.
Your request indicates that the Public School Insurance Advisory Committee (the "Committee"), which the Act abolished effective July 1, 1995, did not renew the public school employees' insurance contract for the 1995-96 school year and that it is necessary for the Board immediately to consider health insurance for public school employees for the upcoming school year. It appears that the Committee chose, pursuant to a bid solicitation, a single health insurance product, which was made available to all public school employees. See A.C.A. §§ 6-17-1109 (Cum. Supp. 1993). It is my understanding that the current contract between the selected insurer and the Committee is renewable, upon mutual agreement, from year to year.
Because an answer to your question is largely dependent upon facts that are not known to this office and upon the Board's interpretation of the Act, I am unable to render a definitive opinion in this instance. I will, however, discuss certain law that may be applicable or give guidance, in an attempt to be of assistance to the Board in carrying out its statutory duties.
Section 1 of the Act sets forth its purposes, including the creation of a single board "to manage the state employee and public school personnel health insurance . . . programs" and "to work toward a common goal that the same multiple benefit options be made available" to both state and public school employees.
Section 4 of the Act sets forth the powers, functions, and duties of the Board. The Board is charged and empowered:
(1) To explore various cost containment measures and funding options.
 (2) To explore methods of reducing the disparity of employer contributions between state employee and public school personnel programs in future years.
 (3) To promote competition among vendors and create a systematic formula for measuring competitiveness of programs not solely based upon lowest administrative fees, but aggregate cost saving mechanisms, quality of care delivery, and accessibility to health care.
 (4) To prepare a comprehensive analysis of the various health plan options offered by the board available to state and public school employees, including cost, quality and access differentials among the various plans, as well as any other comparisons of the plans as will enable the state and school employees to make a well informed choice of plans.
 (5) Undertake studies and take any appropriate action which it determines will promote the financial soundness and overall well-being of the state employee/public school personnel health insurance programs.
Section 5 of the Act sets forth additional duties of the Board and provides as follows:
 The board and the executive director shall take a risk management approach in designing and administering the state employee and public school personnel health benefit programs.
In addition to the objectives stated above, the board shall:
 (1) develop uniform standards of vendor plan funding so as to avoid windfall profits resulting from fully insured non-dividend paying funding arrangements.
 (2) promote increased access to various plan options and health care models with at least: any health maintenance organization (HMO) that offers a Point of Service option to its enrollees; the health benefit plan offered by UAMS sponsored managed care program; and any other plans deemed suitable by the board. Access to managed care will be provided by giving preferential treatment, if required, to those vendors who will enhance benefit options availability in rural Arkansas.
 (3) utilize the combined purchasing power of the state employee/public school personnel programs to foster global competition for all citizens of the state. The board shall communicate publicly through the executive director its findings and observations as relates to the health care market and vendor services expertise. In this fashion, future health care market reforms can be promoted and benefited from the efforts of the state employee/public school personnel programs.
(4) to assure Guaranteed Issue of all plans.
(5) to ensure an annual open enrollment period under all plans.
The Act does not specify the date or dates by which the Board is to fulfill any particular duty imposed by the Act.
It is my view that, when a statute imposes affirmative duties upon an administrative board, agency, or commission without specifying the dates by which the mandated results must be accomplished, the administrative body should be deemed to be in compliance with the statute if it proceeds to implement the statutory scheme in good faith and as rapidly as is consistent with the prudent achievement of the purposes of the statute in the public interest.
A statute will not be interpreted by a court to require that the impossible be accomplished. In Carpenter v. Board of Apportionment,218 Ark. 404, 236 S.W.2d 582 (1951), the board of apportionment delayed its reapportionment past February 1, 1951, because final 1950 census figures were not then available from the federal government, notwithstanding the requirement set forth in Ark. Const. art. 8, § 4, that the reapportionment be completed on or before February 1 immediately following each federal census. The court held that mandamus would not lie to compel the board to complete the reapportionment on the basis of preliminary census figures, subject to adjustment upon receipt of the final figures. The court stated that "it will not be presumed that the intention [of the people in imposing a deadline] was to require the Board to act when the official data upon which its apportionment rested could not be procured." Carpenter, 218 Ark. at 405. If courts will not compel an agency to achieve the impossible by a date set forth in the enactment, it appears likely that they also will not compel such performance by a date operating as a deadline in practical terms, but not mentioned in the enactment.
An administrative body may not, on the other hand, unreasonably delay undertaking a duty imposed upon it by law. In Schirmer v. Cockrill,223 Ark. 817, 269 S.W.2d 300 (1954), the court was faced with the question of whether an administrative body had been "so dilatory and slothful" in carrying out its duties that those duties should, in view of "such extraordinary circumstances," be removed from the agency and imposed upon the circuit court. Schirmer, 233 Ark. at 821-822. The court quoted fromSmith v. Illinois Bell Tel. Co., 270 U.S. 687 (1926), a case in which an administrative agency had taken no action upon an application that had been on file two years:
 For this apparent neglect on the part of the commission, no reason or excuse has been given; and it is just to say that, without explanation, its conduct evinces an entire lack of that acute appreciation of justice which should characterize a tribunal. . . .
Schirmer, 223 Ark. at 821, fn. 2, quoting Smith, 270 U.S. at 591.
The court in Schirmer explained the Supreme Court's holding in Smith as being "that an unreasonable delay by a Board gave the courts just power to act." Schirmer, 223 Ark. at 821, fn. 2. See also Coit IndependenceJoint Venture v. FSLIC, 489 U.S. 561 (1989) (aggrieved party may resort to court proceedings where agency is not required to act within reasonable time).
The federal Administrative Procedure Act contains provisions that are applicable to certain similar questions. Section 555(b) requires agencies to "proceed to conclude a matter presented to it" within "a reasonable time," 5 U.S.C. § 555(b), and section 706 authorizes the courts to "compel agency action unlawfully withheld or unreasonably delayed,"5 U.S.C. § 706. Neither these statutory sections, which of course do not apply here, nor the case law independent of statute sets forth hard and fast rules about the length of time in which an agency may act. Rather,
 there must be a "rule of reason" to govern the time limit to administrative proceedings. Quite simply, excessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decision making into future plans.
Potomac Electric Power Co. v. I.C.C., 702 F.2d 1026, 1034 (D.C. Cir. 1983).
Cases arising under the federal APA suggest that courts will take into account, in assessing whether there has been unreasonable agency delay, the length of time that has elapsed since the agency came under a duty to act; the context of the statute and its purposes; the nature and extent of the consequences of further delay; and the need to set priorities in the face of limited resources. See, e.g., In re International ChemicalWorkers Union, 958 F.2d 1144 (D.C. Cir. 1992).
The Arkansas Administrative Procedure Act provides in part:
 In any case of rule making or adjudication, if an agency shall unlawfully, unreasonably, or capriciously fail, refuse, or delay to act, any person who considers himself injured in his person, business, or property by the failure, refusal, or delay may bring suit in the chancery court of any county in which he resides or does business, or in the Chancery Court of Pulaski County, for an order commanding the agency to act.
Arkansas Code Annotated § 25-15-214 (Repl. 1992).
The Supreme Court of Arkansas has not yet considered a case in which it concluded that an agency failed, refused, or delayed to act, so no guidance is available with respect to the reasonableness of any such failure, refusal, or delay. The only cases appear to be Harber v.Rhodes, 248 Ark. 1188, 455 S.W.2d 926 (1970) (holding unconstitutional but severable the portion of the statute conferring jurisdiction of such suits on the chancery court), and Arkansas State Medical Bd. v. Cross,256 Ark. 388, 507 S.W.2d 709 (1974) (holding that an alleged insufficiency of notice of a hearing did not constitute a failure or refusal to act). At any rate, it appears to me doubtful that the Board's decision not to offer designated HMOs for the 1995-96 school year, if in fact that is the Board's ultimate decision, could be fairly characterized as having taken place within the context of a rule making or adjudication, and thus the statute likely does not apply here.
It is my view that the Board need not offer designated HMOs for the 1995-96 school year if in fact it is impossible for it to do so. It is also my view, however, that the Board must offer designated HMOs as soon as is reasonably possible, consistent with the overall intent of the Act. If it is possible to offer designated HMOs this year but impossible for the Board to carry out fully all of its duties under the Act by the date upon which it must act to provide coverage for public school employees, it should assess whether its offering of designated HMOs, before other duties under the Act have been fulfilled, will be consistent with the statutory scheme and legislative intent and will advance the purposes of the Act in an orderly, reasonable, and rational manner. For example, would it be consistent with the intent behind the whole of the Act for the Board to offer designated HMOs before completing the "comprehensive analysis" and other comparisons required by section 4(4) of the Act? Would the legislative intent be served, and the purposes of the Act rationally advanced, by the offering of designated HMOs even if the other insurance plan required to be offered by the Act (the UAMS plan) could not be offered by the same time, or if the Board had been unable to determine which other plans would also be "suitable?"
Because it appears likely that the Board will be faced with the impossibility of completing every task required by the Act in the short period of time available to it prior to the commencement of the 1995-96 school year, the Board must determine how best to implement the Act over some period of time. In my opinion, the Board's determinations with respect to the schedule of implementation should be respected by any reviewing court, and the Board should be deemed to be in compliance with the Act, if its determinations are reasonable, made in good faith, and provide for implementation of the Act without undue delay, having due regard to the purposes of the entire Act and whether those purposes would not be served by implementation of some mandates of the Act without completion of other required deliberations and actions.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General J. Madison Barker.
Sincerely,
WINSTON BRYANT Attorney General
WB:JMB/cyh