Dissent by Judge N.R. Smith OPINION SCHROEDER, Circuit Judge: INTRODUCTION This case is about the hazards of lead paint in home environments that have been found by scientists to be more dangerous to childrens’ health than earlier supposed. It is an action in the form of an original petition for writ of mandamus to compel the Environmental Protection Agency (“EPA”) to act upon a rulemaking petition it granted eight years ago. The agency does not challenge the science supporting Petitioners’ concerns, but contends its only duty under the statute is to begin a rulemaking proceeding, and that it has no responsibility to make any decisions within a reasonable time or ever. The issues before us are essentially two: whether the agency has a duty to act and, if so, whether the delay has been unreasonable. In determining these issues, we look to the relevant statutory provisions, the controlling law- of this circuit and the more developed law of the District of Columbia Circuit. All strongly support granting the petition. I. Background In 1992, Congress set out a comprehensive scheme to regulate, and eventually eliminate, the risk of lead poisoning in children from pre-1978 structures, those built before lead-based paint was banned for consumer use. Residential Lead-Based Paint Hazard Reduction Act of 1992,, Pub L. 102-550, 106 Stat. 3672 (“Paint Hazard Act”). As part of this program, Congress identified two types of lead risks that needed to be regulated, lead-based paint itself, and dust-lead hazards. Congress delegated to the EPA sole authority to establish national actionable dust-lead hazard standards. 15 U.S.C. § 2683. Congress established an initial standard for lead-based paint, and then divided authority between EPA and the Department of Housing and Ui-ban Development (“HUD”) to adjust the standard lower as needed in the future, with HUD given jurisdiction to set standards for “tar-gel housing,” i.e., public housing, and EPA given jurisdiction for all other locations. Id. § 2681(9). The initial definition of lead-based paint was paint that contained “1.0 milligrams [of lead] per centimeter squared or 0.5 percent by weight” Id. Though EPA was instructed by statute to issue its initial rules identifying dust-lead hazards within eighteen months of October 28, 1992, the rules were not finalized until 2001, when EPA identified the dust lead hazard for all “[c]hild-occupied facilities.” It did so in terms of micrograms per square foot, abbreviated as “fxg/ft[2].” EPA established standards for floors and window sills as “40 |xg/ft[2] on floors or 250 |xg/ft[2] on interior window sills.” 40 C.F,R. § 745.65(b). Based on then available science, EPA estimated that those standards would result in a one to five percent chance of a child developing a blood lead level of 10- micrograms per deciliter (“¡xg/dL”), which was then believed to be the safe blood lead level. Identification of Dangerous Levels of Lead, 66- Fed. Reg. 1206,1215 (Jan. 5, 2001). • Since January of 2001, scientific research has further advanced our understanding of the dangerousness of lead, yet the EPA’s standards have not changed. In 2007, EPA’s Clean Air Scientific Advisory Committee informed the agency that the dust-lead hazard standards were “insufficiently protective of children’s health.” In 2012, the Center for Disease Control (“CDC”) acknowledged that there is no known safe blood lead level. CDC determined that '5 |xg/dL, or half EPA’s target level, should be sufficient to trigger a public health response, what they described as the “level of concern.” The American Academy of Pediatrics has said that the current’ dust-lead hazard standards allow some fifty percent of all children to have a blood lead level above the level of concern, and that EPA’s current standards are ob-soleté. The lead-based paint standard set out originally by Congress also appears to be too high to provide a sufficient level of safety. EPA'does not appear to dispute the factual record developed by Petitioners showing that, according to modern scientific understanding, neither the dust-lead hazard standard nor the lead-based paint standard are sufficient to protect children. Since the petition was filed, HUD has published guidelines lowering the acceptable dust-lead hazard standard in public housing for floors arid window sills to the levels Petitioners asked for in this case. By 2009 those worried about environmental hazards to childrens’ health were concerned that the standards were too lenient. Of the eight current Petitioners, four (Healthy Homes Collaborative, New Jersey Citizen Action, Sierra Club, and United Parents Against Lead) filed an administrative petition with the EPA on August 10, 2009. The petition asked the EPA to use its rulemaking authority to “more adequately protect ... children,” specifically by lowering the dust-lead hazard standards to 10 |xg/ft[2] for floors and 100 fjig/ft[2] for window sills, and to lower the standard for lead-based paint to 0.06 percent lead by weight. After a notice and comment period on the petition, EPA sent the Petitioners a letter on October' 22, 2009, “granting] [their] request” for a rulemaking, though without a commitment to a specific rulemaking outcome ■ (e.g., adoption of the standards sought by Petitioners) or a specific date certain for promulgation of the rule. EPA noted that because it shared jurisdiction with HUD over lead-based paint, it would work with HUD on that aspect of the petition. This letter is the last direct communication any of the Petitioners received from EPA prior to their filing this mandamus petition. . In the meantime, both publicly and privately, however, EPA appears to have done some work. In 2010, EPA formed' a Science Advisory Board Lead Review Panel (“SAB Panel”) to provide advice on the process. EPA sent the SAB Panel a 'proposed methodology' for dust-lead hazard standards in June 2010, and soon received comments noting that the approach was reasonable. In November of 2010, EPA sent the SAB Panel an updated proposed methodology which the SAB Panel again signed off on. In 2011, EPA performed a literature review which determined that technology was developed and feasible for detecting lower .levels of dust lead. The EPA also coordinated with HUD to develop a survey of target housing to determine whether lower lead clearance levels were feasible. The survey was. developed by June of 2012, authorized in May of 2014, and completed in October of 2015. The survey indicated that lower lead clearance levels were in fact feasible. EPA acknowledges it received the survey results, but that appears to have been the last action that EPA has taken. Petitioners filed this mandamus petition about nine months later, in August of 2016, asking this court to hold that EPA has unreasonably delayed promulgation of the promised rule, and asking that this court compel EPA to issue a proposed and final ■rule in the near future. EPA responded that it has beeh working diligently and that mandamus is unnecessary. EPA’estimated that a proposed rule might be ready to be issued in 2021, and that a final ruie could come in 2023. This court’s jurisdiction to consider. this petition is dependent on our jurisdiction to review a final rule. Final EPA rules may be reviewed in either the Court of Appeals for the D.C, Circuit, or any Court of Appeals for a circuit where any petitioner resides or has its principal place of business, 15 U.S.C. § 2618(a). Any court that would have jurisdiction to review a final rule has jurisdiction to determine if an agency’s delay is unreasonable. Telecomms. Research & Action Ctr. v. FCC, 750 F.2d 70, 75 (D.C. Cir. 1984) (“TRÁC’). Three of the Petitioners (California Communities Against ’ Toxics, Healthy Homes Collaborative, and Sierra Club) have their principle place of business in California, and thus jürisdiction would be proper in this court if they were challenging a final rule. Under the All Writs Act, this court is allowed to issue all writs appropriate “in aid of [our] respective jurisdiction ].” 28 U.S.C. § 1651(a). We therefore have jurisdiction to consider this mandamus petition. When deciding whether to grant a mandamus petition on the grounds of unreasonable delay, this court applies the six factor balancing test set out by the D.C. Circuit in TRAC. See Indep. Mining Co. v. Babbitt, 105 F.3d 502, 507 (9th Cir. 1997) (adopting the so-called TRAC factors). Of course, an agency cannot unreasonably delay that which it is not required to do, so the first step before applying the TRAC factors is necessarily to determine whether the agency is required to act, that is whether it is under a duty to act. See Norton v. S. Utah Wilderness All. 542 U.S. 55, 63 n.1, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). It is to the question of duty we turn first. II. Duty Petitioners point to two statutory frameworks they contend create a duty for the EPA to act. First, they argue there is a clear duty under the Toxic Substances Control Act (“TSCA”) and the amendments to it from the Paint Hazard Act. Second, they argue that the Administrative Procedure Act (“APA”) itself places a clear duty on EPA to take final action on their 2009 petition. We agree with Petitioners that a duty to act can be found in both. In enacting the Paint Hazard Act, Congress was clear about what it wanted: to “prevent childhood lead poisoning” and “eliminate lead-based paint hazards in all housing as expeditiously as possible.” 42 U.S.C. § 4851a(l), (3). EPA was instructed to “identify” whatever might constitute a “lead-based paint hazard,” that Congress defined as a “condition that causes exposure to lead ... that would result in adverse human health effects.” 15 U.S.C. §§ 2681(10), 2683. The TSCA further makes clear that this is an ongoing duty, authorizing EPA to amend any regulations when necessary, including in the case of lead-based paint, amending the initial standard authorized by Congress. Id. § 2687. Further, Congress specifically demanded the creation of a task force that would be instructed to advise EPA and HUD as to “revising ... regulations ... issued by [HUD] and other Federal agencies relating to lead-based paint poisoning prevention.” 42 U.S.C. § 4852a(a), (c)(5). This statutory framework clearly indicates that Congress did not want EPA to set initial standards and then walk away, but to engage in an ongoing process, accounting for new information, and to modify initial standards when necessary to further Congress’s intent: to prevent childhood lead poisoning and eliminate lead-based paint hazards. Despite the dissent’s attempt to recharacterize congressional intent, Congress did not simply state a goal when enacting the TSCA and the Paint Hazard Act; Congress established statutory standards that the EPA must enforce. 15 U.S.C. § 2683 (“Within 18 months after October 28, 1992, the Administrator shall promulgate regulations which shall identify, for purposes of this subchapter and the [Paint Hazard Act], lead-based paint hazards, lead-contaminated dust, and lead-contaminated soil.”); id. § 2687 (“The regulations may be amended from time to time as necessary.”). The EPA does not dispute that now available information shows the insufficiency of its present standards for achieving Congress’s purposes. Moreover, even if we could conclude the EPA had no duty to act under the TSCA and the Paint .Hazard Act, the EPA has a clear duty to act under the APA. The APA requires agencies to “conclude a matter presented to it” “within a reasonable time.” 5 U.S.C. § 555(b). This has been interpreted to mean that an agency has a duty to fully respond to matters that are presented to it under its internal processes. See In re Am. Rivers & Idaho Rivers United, 372 F.3d 413, 418 (D.C. Cir. 2004). The Petitioners’ 2009 petition is such a matter. EPA argues that it has already done everything this duty requires it to do by, in its words, “begin[ning] an appropriate proceeding.” In EPA’s view, that is the only commitment to the Petitioners the agency made when it granted the August 2009 petition. The 2009 petition, however, did not petition EPA to begin a proceeding; it petitioned EPA to engage in rule-making to lower the lead standards. The Petitioners also provided their view of what reasonable lead standards would be. EPA granted this petition for a rulemak-ing, though not promising a specific time-line or to specifically adopt the outcome offered by the Petitioners. Under these circumstances, EPA is under a clear duty to act. Under the applicable law, the EPA has to reach some final decision. To “conclude [the] matter,” EPA must enter a final decision subject to judicial review, and they must do so “within a reasonable time.” 5 U.S.C. § 555(b); see Pub. Citizen Health Research Grp. v. Comm’r, Food & Drug Admin., 724 F.Supp. 1013, 1020 (D. D.C. 1989) (“Once an agency decides to take a particular action, a duty to do so within a reasonable time is created.”). An agency “cannot simply refuse to exercise [its] discretion” to conclude a matter. Indep. Mining Co., 105 F.3d at 507 n.6. Having chosen to grant the petition for rulemaking, EPA came under a duty to conclude a rulemak-ing proceeding within a reasonable time. The agency does not comply with that duty merely by “begin[ning] an appropriate proceeding.” Support for the existence of a clear duty under these circumstances is found in analogous D.C. Circuit cases regarding the Occupational Safety and Health Administration (“OSHA”). The D.C. Circuit has held that when Congress creates an initial standard but grants OSHA regulatory authority to amend the standard, OSHA is under a duty to act where there is an “obvious need, apparent to OSHA” to alter the initial standard in light of new information. Pub. Citizen Health Research Grp. v. Auchter, 702 F.2d 1150, 1154, 1158 (D.C. Cir. 1983) (per curiam). The D.C. Circuit has further held that an agency must, under the APA, “conclude within a reasonable time a matter presented to it.” Id. at 1153-54 (alterations omitted); see also In re Int’l Chem. Workers Union, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (per curiam). These principles apply here. Under the TSCA and the Paint Hazard Act, Congress set EPA a task, authorized EPA to engage in rulemaking to accomplish that task, and set up a framework for EPA to amend initial rules and standards in light of new information. The new information is clear in this record: the current standards for dust-lead hazard and lead-based paint hazard are insufficient to accomplish Congress’s goal, thereby creating an “obvious need, apparent to [the EPA.]” See Pub. Citizen Health Research Grp., 702 F.2d at 1154. Furthermore, because the EPA granted the Petitioners’ rulemaking petition, it came under a duty to conclude the rulemaking proceeding within a reasonable time. See id.; In re Int’l Chem. Workers Union, 958 F.2d at 1150. The dissent refuses even to acknowledge the conflict its position creates with these principles. We also note that failing to find a duty would create a perverse incentive for the EPA. In our court’s most recent unreasonable delay case, we granted mandamus where the EPA had not responded to an administrative petition for rulemaking after eight years. See Pesticide Action Network N. Am. v. EPA, 798 F.3d 809 (9th Cir. 2015). The EPA distinguishes that case on the ground that here it has responded by granting this petition. Under the EPA’s view, were it not to respond to the petition at all, this court could grant mandamus and compel a time table for rulemaking, yet if EPA “grants” the petition it can then delay indefinitely, without any recourse to the Petitioners. This would allow the EPA to grant petitions for rule-making and take no action in order to’ avoid judicial review. The dissent’s position that the EPA is under no duty to act leaves the agency unaccountable and our children unsafe. 'We thus conclude the EPA is under a' duty stemming from the TSCA and the Paint Hazard Act to update lead-based paint and dust-lead hazard standards in light of the obvious need, and a duty under the APA to fully respond to Petitioners’ rulemaking petition. A writ of mandamus is appropriate if Petitioners have made a showing that the delay has been unreasonable. We turn to that question now. III. Unreasonable Delay In this ‘ circuit, in cases seeking mandamus, unreasonable delay is evaluated under the TRAC factors. See Indep. Mining Co., 105 F.3d at 507. There are six TRAC factors: (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speéd with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed. 750 F.2d at 80 (citations and internal quotation marks omitted). The most important is the first factor, the “rule of reason,” though it, like the others, is not itself determinative. See In re Core Commc’ns, Inc., 531 F.3d 849, 855 (D.C. Cir. 2008). We have to consider them all. This court has discussed the TRAC factors in at least three unreasonable delay mandamus cases. Most recently, we granted the writ in Pesticide Action. There, the petitioners sought ,a rulemaking from the EPA that would revoke the approval of a particular pesticide, chlorpyrifos. Pesticide Action Network N. Am,, 798 F.3d at 811. The EPA had not acted. Id. This, court focused on the first and third. TRAC factors, both of which favored granting the writ. Id. at 814. With regard to. the third factor, we noted that “EPA’s own assessment” was that the pesticide presented “dangers to human health.” Id. With regard to the rule of reason, we noted that EPA had been considering the petition for eight years, and EPA stated only that it intended to issue a proposed rule after yet another year had passed. Id. We held that after eight years and without a “ ‘concrete timeline’ for resolving the petition,” but only a “roadmap for. further delay,” EPA .had “stretched the ‘rule of reason’ beyond its limits.” Id. This case is similar in the length of delay, absence of a reasonable timetable, and harm to health. EPA eventually filed its response to its petition by denying it, thus complying with our order and allowing petitioners access to administrative review, which may be followed by judicial review of the substance. See Pesticide Action Network N. Am., 863 F.3d at 1132-33. In our two other cases, claiming unreasonable delay, we denied the petition. In In re California Power Exchange, petitioners sought to compel the Federal Energy Regulatory Commission to issue a final order regarding outstanding refund requests, but a mere four months after the requests were made. 245 F.3d 1110, 1125 (9th Cir. 2001). We declined, noting that unreasonable delays under the TRAC factors “involve[ ] delays of years, not months.” Id. And in Independence Mining, petitioner sought mandamus relief after two to three years of waiting for the Secretary of the Interior to act on its mineral patent claims. 105 F.3d at 505. We rejected the petitioner’s argument that the rule of reason favored it, in part because Congress had recently expressly given the Secretary of the Interior five years to resolve outstanding applications. Id. at 509. We also rejected the petitioner’s argument that the third (human welfare) and fifth (interests prejudiced) factors favored issuing the writ, due to the uncertainty over its mining claims and in view of the mines’ employment of 600 people. Id. at 509-10. We -noted that the patents were unnecessary for the company to continue to operate and employ its workers, and the company had provided no evidence that employees’ jobs were at risk, or that there were any real interests prejudiced by the delay. Id. Our case law thus supports our holding that the TRAC factors favor issuance of the writ in this case. As in Pesticide Action, EPA’s delay here is into its eighth year, and EPA has not offered a “concrete timetable” for final action, but only speculative dates four and six years in the future when it might take final action. This is not a case like Independence Mining or California Power Exchange where the delay has been only months or a few years. Further, like Pesticide Action, and unlike Independence Mining or California Power Exchange, there is a clear threat to human welfare; indeed EPA itself has acknowledged that “[l]ead poisoning is the number one environmental health threat in the U.S. for children ages 6 and younger” and that the current standards are insufficient. The children exposed to lead poisoning due to the failure of EPA to act are severely prejudiced by EPA’s delay, and the fifth factor thus favors issuance of the writ. Finally, Congress has asserted that the threat of lead poisoning must be eliminated expeditiously, and thus the second TRAC factor also favors the issuance of the writ. Even assuming that EPA has numerous competing priorities under the fourth factor and has acted in good faith under the sixth factor, the clear balance of the TRAC factors favors issuance of the writ. Cases from the D.C. Circuit buttress this conclusion. The D.C. Circuit has noted that “a reasonable time for agency action is typically counted in weeks or months, not years” and thus a “six-year-plus delay is nothing less than egregious.” In re Am. Rivers & Idaho Rivers United, 372 F.3d at 419. On the other hand, a “14-month time period” without more is not unreasonable. United Steelworkers of Am. v. Rubber Mfrs. Ass’n, 783 F.2d 1117, 1120 (D.C. Cir. 1986). Other D.C. Circuit cases largely fall into' this- pattern. See, e.g., In re Int’l Chem. Workers Union, 958 F.2d at 1150 (six year delay unreasonable for rulemak-ing); In re Core Commc’ns Inc., 531 F.3d at 857 (same); In re Bluewater Network, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (nine year delay unreasonable). Critically, EPA fails to identify a single case where a court has upheld an eight year delay as reasonable, let alone a fourteen year delay, if we take into account the six more years EPA asserts it needs to take action. Therefore, we grant the petition for the writ of mandamus. IV. Remedy Having determined that Petitioners are entitled to mandamus, we now turn to the question of the contents of the writ. Petitioners ask that we order EPA to issue a proposed rule within ninety days and a final rule within six months. EPA does not provide an alternative timeline, other than its vague intention to issue a proposed rule in four years and a final rule in six, a timeline we hold to be unreasonable. In Pesticide Action, we ordered the EPA to issue a proposed rule in ninety days, and to provide a timeline for a final rule at that time. 798 F.3d at 815. We also look to the D.C. Circuit, which has more frequently dealt with unreasonably delayed rulemakings. In International Chemical Workers Union, the D.C. Circuit granted mandamus on March 20,1992, and ordered OSHA to submit a final rule by August 31, 1992. 958 F.2d at 1150. In Public Citizen Health Research Group, the D.C. Circuit ordered OSHA to issue a notice of proposed rulemaking within thirty days and to expedite the final rule on a priority basis, earlier than OSHA’s estimate of one and a half years. 702 F.2d at 1159. Using an alternative device, in In re United Mine Workers of America International Union, 190 F.3d 545, 556 (D.C. Cir. 1999), the D.C. Circuit granted mandamus and ordered the Mine Safety and Health Administration to issue periodic status reports on its progress toward promulgation of a final rule. All these cases make it clear that when there has been an unreasonable delay in rulemaking, courts have power and discretion to enforce compliance within some form of timeline. EPA does not dispute this court’s authority, but argues that the timeline sought by the Petitioners, ninety days for a proposed rule and six months for a final rule, would force EPA to act without due deliberation. We are mindful of the need for EPA to issue a well-conceived rule, and not merely a rule, and that new issues may arise during a notice and comment period that demand further study; we are also mindful that we lack expertise in fashioning timetables for rulemaking. We must observe, however, that EPA has already taken eight years, wants to delay at least six more, and has disavowed any interest in working with Petitioners to develop an appropriate timeline through mediation. We are also mindful of the severe risks to children of lead-poisoning under EPA’s admittedly insufficient standards. These circumstances are reminiscent of the circumstances we confronted in Pesticide Action, and thus we issue a timeline to the EPA materially similar to the one issued there with respect to the promulgation of a proposed rule and permitting of the possibility of timeline modification. Accordingly, we order (1) that EPA issue a proposed rule within ninety days of the date that this decision becomes final; (2) that EPA promulgate the final rule within one year after the promulgation of the proposed rule; and (3) that the deadlines for both the proposed rule and the final rule will only be modified if EPA presents new information showing modification is required. This court retains jurisdiction for purposes of ensuring compliance until EPA issues a final order subject to judicial review. The petition for writ of mandamus is GRANTED. . Petitioners requested that their petition be granted under either 15 U.S.C. § 2620 ("Citizens’ petitions”.under the TSCA) or 5 U.S.C. § 553(e)'(right to petition for rulemaking under the APA). The EPA granted the request under the APA. Petitioners have not argued that their request should have been granted under tire 15 U.S.C. § 2620.