**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| A COMMUNITY VOICE; CALIFORNIA COMMUNITIES AGAINST TOXICS; HEALTHY HOMES COLLABORATIVE; NEW JERSEY CITIZEN ACTION; NEW YORK CITY COALITION TO END LEAD POISONING; SIERRA CLUB; UNITED PARENTS AGAINST LEAD NATIONAL; WE ACT FOR ENVIRONMENTAL JUSTICE, *Petitioners*, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, *Respondents*. | No. 19-71930 <br><br> EPA No. EPA-HQ-OPPT-2018-0166 <br><br><br> OPINION |

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted October 27, 2020
San Francisco, California

Filed May 14, 2021

Before:  Mary M. Schroeder and N. Randy Smith, Circuit Judges, and Lawrence L. Piersol,[*] District Judge.

Opinion by Judge Schroeder;
Dissent by Judge N.R. Smith

## SUMMARY[**]

### Toxic Substances Control Act

Granting a petition for review, the panel remanded without vacatur the Environmental Protection Agency ("EPA")'s Final 2019 Rule, which was a response to this court's 2017 Writ of Mandamus directing the EPA to respond to the need for updated lead-based paint hazard standards.

Petitioners contended that the 2019 Rule violated statutory provisions of the Residential Lead-Based Paint Hazardous Reduction Act ("PHA") that are codified in Title IV of the Toxic Substances Control Act ("TSCA"), as well as rulings of this court in the Writ.

The panel held that there was a Congressional mandate to establish lead-based paint standards, and the EPA was charged with setting and updating three separate hazard standards:  the dust-lead hazard standards ("DLHS"), the

---

[*] The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

paint-lead hazard standards, and the soil-lead hazard standards.

Concerning DLHS, which relate to household dust, the panel held that the EPA must reconsider the dust-level health standards. The panel held that the 2019 Rule lowered the lead hazard level but not to a level sufficient to protect health as Congress directed, because the EPA looked to factors in addition to health risks. The EPA's interpretation of its statutory authority was contrary to the statutory language and express congressional purpose, as well as the Supreme Court's interpretation of parallel language in other statutes and the EPA's own prior interpretation on this provision.

Concerning the lead-based paint definition, the panel held that the EPA failed to meet its ongoing duty to account for new information and modify initial standards when necessary to further Congress' intent to eliminate lead-based paint hazard. The panel held further that the EPA's failure to do so, despite the clear body of evidence commanding a new definition, violated Title IV of the TSCA. In addition, the EPA's failure to provide any sensible explanation for its delay made the inaction arbitrary and capricious.

Concerning the soil-lead hazard standards, the panel held that the EPA's existing soil-lead hazard standards did not identify all levels of lead in soil that are dangerous to human health, and thus was contrary to Title IV of the TSCA. The panel held that the EPA had an ongoing duty to update the standards, and it could not recite "scientific uncertainty" to evade its statutory duty to update regulations. The panel concluded that the EPA's decision to abandon the soil-based hazard standards for the last two decades violated Title IV of the TSCA.

Consistent with its holding that the EPA must reconsider the DLHS, the panel directed the EPA to reconsider the dust-lead clearance levels as well in the same proceeding. Both sets of standards are interrelated and must work together to effectuate Congress' intent to end the hazards of lead paint in children.

Dissenting, Judge N.R. Smith would deny the petition for review. He would hold that the statutory scheme of the TSCA and PHA authorized the EPA to consider both health and nonrisk factors in setting the DLHS; the EPA did not act arbitrarily or capriciously in setting those levels; and the EPA did not violate the 2017 Writ in declining to set soil-based hazard standards.

## COUNSEL

Jonathan J. Smith (argued), Eve C. Gartner, Victoria Bogdan Tejeda, and Sophia B. Jayanty, Earthjustice, New York, New York, for Petitioners.

Daniel R. Dertke (argued), Attorney Environmental Defense Section; Jonathan D. Brightbill, Principal Deputy Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Steve Anderson, Office of the General Counsel, United States Environmental Protection Agency, Washington, D.C.; for Respondents.

Bethany A. Davis Noll, Institute for Policy Integrity, New York, New York, for Amicus Curiae Institute for Policy Integrity.

Erik C. Baptist, Richard W. Smith, and Douglas C. Dreier, Wiley Rein LLP, Washington, D.C., for Amici Curiae National Association of Home Builders of the United States, Window & Door Manufacturers Association, National Multifamily Housing Council, and National Apartment Association.

Emily A. Benfer, Health Justice Advocacy Clinic, Morningside Heights Legal Services Inc., Columbia Law School, New York, New York, for Amici Curiae American Academy of Pediatrics, American Public Health Association, National Association of County and City Health Officials, Network for Public Health Law, and Dr. Bruce Lanphear.

Tom Neltner, Silver Spring, Maryland, for Amicus Curiae Lead and Environmental Hazards Association.

## OPINION

SCHROEDER, Circuit Judge:

## INTRODUCTION

This case is part of what is becoming a lengthy, not very hopeful, saga of our nation's efforts to deal with the dangers of lead paint that remain in older housing, in soil, as well as in the residue of earlier clean ups. Before us is the Environmental Protection Agency's Final 2019 Rule, promulgated after this court issued a Writ of Mandamus in 2017 in response to years of inaction by the Environmental Protection Agency (EPA). *In re A Community Voice*, 878 F.3d 779 (2017).

When Congress passed the Residential Lead-Based Paint Hazard Reduction Act (PHA) in 1992, our government's attempts to deal with the dangers of the paint appeared to ramp up. Congress acted in the wake of alarming scientific findings that American children suffer from widespread low-level lead poisoning. Nearly nine years later, in 2001, the EPA issued regulations that included lead-based paint hazard standards, but by 2009 it had become clear those standards were not adequate and that the EPA was being too slow to react. The situation prompted several organizations, many of whom are also Petitioners here, to file a rulemaking petition asking the EPA to update the dust-lead hazard standards, dust-lead clearance levels, and the definition of lead-based paint (2009 Petition).

The EPA granted the 2009 Petition, but nearly eight years elapsed without any rulemaking. Petitioners therefore sought a directive to the EPA from this court, and in 2017 we issued the writ of mandamus (Writ) in the face of the EPA's continued failure to act. *See id.*

The 2019 Rule challenged here is the EPA's response to the Writ. The Rule, however, does not update the definition of lead-based paint, nor does it update the dust-lead clearance levels or soil-lead hazard standards. It lowers the standards for dust-lead hazards, but to an extent less than what the Petitioners say the law requires. The Petitioners contend the 2019 Rule violates important statutory provisions of the PHA that are now codified in Title IV of the Toxic Substances Control Act (TSCA IV), as well as rulings of our court in the Writ.

Petitioners' standing is not challenged. Nor is our jurisdiction, because the TSCA IV gives the Courts of

Appeals exclusive jurisdiction to review final rules. 15 U.S.C. § 2618(a)(1)(B).

The most serious issue of statutory interpretation in the case concerns the definitions of the lead-based paint hazard standards and whether they comply with the TSCA's requirement that the EPA identify "any condition" of lead in dust, paint, and soil that would result in "adverse human health effects as established by the administrator under [TSCA IV]." 15 U.S.C. §§ 2683, 2681(10). Petitioners contend that the TSCA requires the EPA to set the standards on the basis of the EPA's assessment of health risks and without regard to factors such as cost. The EPA's position is that, although this provision of the TSCA refers only to health effects, the EPA may also look to other factors, having to do with feasibility and efficacy. It reasons that because it is now well established that any level of lead in the blood leads to adverse health effects, the statutory language gives the EPA discretion to select hazard standards it wishes to enforce, rather than ones aimed at eliminating health risks. Congress, however, said that the EPA was to look at risks to health. We interpret the statute accordingly. The current dust-lead hazard standards, lead-based paint definition, and soil-lead hazard standards do not identify all levels of lead that lead to adverse human health effects and therefore violate the TSCA.

Petitioners also contend that the EPA's failure to update the definition of both lead-based paint and the soil-lead hazard standards is arbitrary and capricious. The EPA has continually refused to update the lead-based paint definition on the ground that it lacks sufficient information. We conclude that its failure to explain why such lack of data has persisted for more than a decade, in the face of mounting evidence of lead-based paint dangers, is arbitrary and

capricious. *See Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011). The failure to update the soil-lead hazard standards is unjustified in the face of the now undisputed evidence that there is no safe level of lead exposure.

The EPA did not deal with dust-lead clearance levels in this 2019 Rule because it has referred the subject to separate rulemaking. No record of that proceeding is before us. Because the dust-lead clearance levels concern the lead content of dust after abatement of dust-lead hazards, the dust-lead hazard standards (DLHS) and the clearance levels are interrelated. Since, as a result of this proceeding, we have ordered the EPA to reexamine the DLHS, the same fate must await the clearance levels.

Before discussing the standards the EPA did promulgate within this Rule, we briefly review the history of federal lead paint regulation, a history that many might characterize as sluggish. Our earlier opinion contains a fuller summary.

## BACKGROUND AND SUMMARY

Lead-based paint was banned for consumer use in 1978, but it was not until more than a decade later, in 1992, that Congress enacted the Residential Lead-Based Paint Hazard Reduction Act (PHA). Pub L. 102-550, 106 Stat. 3672. The Act amended the TSCA adding Title IV entitled "Lead Exposure Reduction." 15 U.S.C. §§ 2681–92. TSCA IV delegated to the EPA authority to establish lead-based paint hazards. Congress also established the original definition of lead-based paint with reference to the level of lead it contained, and provided the EPA could establish future levels that would apply in all locations other than older housing,

where standards were to be set by the U.S. Department of Housing and Urban Development. *Id.* § 2681(9). Congress prescribed a rapid, 18-month timeline for EPA's promulgation of lead-based paint hazards, *id.* § 2683, but the EPA did not finalize standards until 2001. 40 C.F.R. § 745.65 (2001) (amended Jan. 6, 2020). These standards were believed by the EPA, at the time, to be sufficient to maintain a safe blood lead level (BLL) in children.

Within a few years, however, scientific knowledge had progressed to the point where it was generally understood that there is no safe level of lead, so that the previous lead-based paint standards were inadequate. Yet the EPA did not act. By 2009, several of the entities that are Petitioners before us became concerned with the EPA's inaction and filed an administrative petition with the EPA asking for rulemaking. They urged the EPA to lower the DLHS and associated dust-lead clearance levels from 40 $\mu g/ft^2$ of surface area to 10 $\mu g/ft^2$ or less for floors and from 250 $\mu g/ft^2$ of surface area to 100 $\mu g/ft^2$ or less for windowsills. The 2009 Petition also asked the EPA to broaden the definition of lead-based paint to include all conditions that were then-known to be toxic. The 2009 Petition asked the EPA to "reduce the level of lead in paint that would define a lead-based paint from 0.5 percent by weight to 0.06 percent by weight, with a corresponding reduction in the 1.0 milligram per square centimeter standard."

The EPA granted the 2009 Petition and conducted some follow-up studies but took no rulemaking action. Petitioners then filed the mandamus action that resulted in our 2017 opinion. We there held the EPA had a duty to act and that it had unreasonably delayed in doing so. *See In re A Community Voice*, 878 F.3d at 779. We said that the EPA has

a duty stemming from the TSCA "to engage in an ongoing process, accounting for new information, and to modify initial standards when necessary to further Congress's intent: to prevent childhood lead poisoning and eliminate lead-based paint hazards." *Id.* at 784. We also recognized the EPA's duty stemming from the Administrative Procedures Act (APA) to fully respond to petitions for rulemaking in a reasonable amount of time. *Id.* at 786. We ordered the EPA to take action within 90 days of our opinion becoming final, and to promulgate a final rule within a year. *Id.* at 788.

The EPA in 2019 adopted the Final Rule that is before us, but addressing only the DLHS. The EPA lowered the DLHS to 10 μg/ft$^2$ and 100 μg/ft$^2$ for floors and windowsills, respectively (10/100 Standards). These match the levels requested in the 2009 Petition which had been submitted ten years earlier. In promulgating the 2019 Rule, the EPA acknowledged that its earlier, 2018, proposed rule had drawn many comments that a lower standard was needed to protect children's health, but the EPA nevertheless adopted the 2019 Rule as originally proposed.

The EPA now contends that, in promulgating a more lenient standard than that necessary to protect children's health, it properly took into consideration factors other than health, such as feasibility and efficacy. This gives rise to the primary issue of statutory interpretation that we must resolve in this proceeding. The TSCA IV requires the EPA to identify "any condition" of lead in dust, paint, and soil resulting in adverse human health effects. 15 U.S.C. § 2681(10). The EPA's position is that the statute grants it discretion to look to factors outside of adverse effects on health. Its interpretation, however, is not supported by the language of TSCA IV, or Congress's purpose in enacting its

lead-based paint provisions, which are directed toward protecting children's health by reducing exposure to lead. We therefore resolve that legal issue in favor of the Petitioners.

The 2019 Rule does nothing with respect to the lead-based paint definition, with the EPA explaining, as it had in 2001, that it lacks sufficient data. The Rule also does nothing with respect to the soil-lead hazard standards, with the EPA taking a similar position that it lacks sufficient data to update the standards, and, further, that it is under no duty to do so by virtue of either the statute or the Writ. Petitioners contend that the EPA's failure to update the lead-based paint definition and soil-lead hazard standards violates the EPA's ongoing statutory duty to maintain and update the lead-based paint hazard standards. We have already recognized such a duty. *A Community Voice*, 878 F.3d at 784. The EPA's continued reliance on inadequate information for approximately two decades is arbitrary and capricious and in violation of its statutory obligation of scientific currency.

The dust-lead clearance levels are directly related to the DLHS because the clearance levels represent the levels of lead in dust that can remain after dust-lead has been abated. 40 C.F.R. § 745.227(e)(8)(viii). The EPA has expressly recognized an apparent need for updating the clearance levels, yet it has set in motion a rulemaking process separate and apart from this proceeding. The relationship between the DLHS and clearance levels indicates that a change to the DLHS requires the simultaneous reconsideration of the associated clearance levels. This has not been done.

We therefore remand the 2019 Rule and direct the EPA to reconsider the DLHS and to do so in conjunction with the

dust-lead clearance levels that have been the subject of separate proceedings.  We also hold that the EPA is statutorily required to engage in the appropriate rulemaking to update the definition of lead-based paint and soil-lead hazard standards.  In this Rule, the EPA has taken some action with respect to the DLHS, albeit insufficient.  Some action is better than no action, so we remand the 2019 Rule without vacating it.

## DISCUSSION

### I. The Congressional Mandate to Establish Lead-Based Paint Hazards

Congress enacted the PHA because it recognized that lead paint was a national problem that required an urgent response. Its stated purpose was "to develop a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible." 42 U.S.C. § 4851(a)(1).  In amending the TSCA through the PHA, Congress delegated regulatory authority to the EPA and instructed it, among other tasks, to establish hazard standards that delineate levels at which lead becomes dangerous. 15 U.S.C. § 2683.  Identifying the levels of lead in paint, as well as in dust and soil, that created dangers to health seemed to be an essential step in the effort to protect our nation's children from the toxic effects of lead.

Congress thus instructed the EPA to promulgate regulations identifying lead-based paint hazards, and to do so within 18 months.  *Id.*  The standards serve a number of purposes.  They inform the public about what constitutes dangerous levels of lead in order to further risk assessment and abatement strategies.  States rely on the national

standards in setting forth their own lead programs.  Public disclosures about lead dangers in most older housing must include the standards.  42 U.S.C. § 4852(d).

Congress told the EPA to identify the level at which lead becomes dangerous to human health when contained in principal sources of lead poisoning.  15 U.S.C. § 2681(10)*.* It instructed the Administrator to set the hazard levels to identify "any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, lead-contaminated paint… that would result in adverse human health effects as established by the Administrator under this chapter."  *Id.* § 2681(10)*.*  This means the EPA is charged with setting and updating three separate hazard standards: the dust-lead hazard standards, the paint-lead hazard standards, and the soil-lead hazard standards.  The Petitioners challenge what the EPA has done or has not done with respect to all three types of hazards.

## A. Dust-Lead Hazard Standards

Dust-lead hazard standards relate to household dust.  Lead gets into household dust through lead-based paint debris, so children are exposed to lead through the dust in their homes. According to the EPA's own 2017 model, lead from dust and soil accounts for over seventy percent of lead exposure in children ages one through six with the highest levels of lead in their blood, and it accounts for over fifty percent of lead exposure in infants with the highest blood lead levels. Valerie Zartarian, et. al., *Children's Lead Exposure: A Multimedia Modeling Analysis to Guide Public Health Decision-Making*, Environmental Health Perspectives, 097009-4 (Sept. 12, 2017), ehp.niehs.nih.gov/doi/pdf/ 10.1289/EHP1605. TSCA IV defines lead-contaminated dust

as "surface dust in residential dwellings that contains an area or mass concentration of lead in excess of levels determined by the Administrator under this subchapter to pose a threat of adverse health effects in pregnant women or young children." 15 U.S.C. § 2681(11). The DLHS are meant to identify the levels where lead-contaminated dust within buildings pose a danger to human health. The EPA has historically chosen to promulgate two hazard standards for dust-lead: the level at which the concentration of dust-lead becomes unsafe on floors, and the level at which it becomes unsafe on windowsills. Together they comprise the DLHS.

The EPA first set the DLHS in 2001, a delayed response to Congress's 1992 demand. In response to the Writ, the EPA reset the DLHS in this 2019 Rule. The new standards are 10 $\mu g/ft^2$ for floors and 100 $\mu g/ft^2$ for windowsills, and have been dubbed the 10/100 Standards. In promulgating the Standards, however, the EPA did not try to set them at the threshold level that causes harm to human health, but also took into account outside factors bearing on implementation, such as current testing capabilities. The Petitioners contend there is a clear statutory directive that the EPA set the hazard standards at the point at which the level dust-lead creates hazards to human health. The Petitioners say the 10/100 Standards are too high, because they permit harm to children's health.

Under the DLHS as promulgated, there will be adverse human health effects. The EPA does not dispute this fact. The EPA argues that it has the discretion to set the levels at its choosing, even if they permit threats to children's health, because the statute contains a general delegation of regulatory authority to the Administrator.

The language on which it relies is contained in the statutory definition of "lead-based paint hazards." 15 U.S.C. § 2681(10). The provision reads as follows:

> The term "lead-based paint hazard" means any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, lead-contaminated paint that is deteriorated or present in accessible surfaces, friction surfaces, or impact surfaces that would result in adverse human health effects as established by the Administrator under this subchapter.

The EPA argues that the statutory language "as established by the Administrator" modifies the previous phrase, "would result in adverse human health effects," and therefore the EPA has broad discretion to determine what level of harm constitutes a hazard, taking into account factors other than health. The Petitioners contend that this provision instructs the EPA to look only to health.

The natural reading is that the delegation to the EPA is to establish the conditions that cause harm, not what constitutes harm. The provision contains no directive to consider factors apart from health. The language of the provision supports Petitioners' interpretation.

Congress made clear its purpose in amending the TSCA was to eliminate lead-based paint hazards: "to develop a national strategy . . . to eliminate lead-based paint hazards in all housing as expeditiously as possible." 42 U.S.C. § 4851(a)(1). The TSCA IV's statutory scheme reflects this purpose and also supports Petitioners' interpretation. The

statute charges the EPA with identifying "dangerous levels of lead." *See* 15 U.S.C. § 2683. The definitional provisions in Section 2681 contain separate definitions of "lead-contaminated dust" and "lead-contaminated soil" that, like the definition of lead-based paint hazards, reference harm to health and no other factors. Section 2681(11) defines lead-contaminated dust as "surface dust in residential dwellings that contains an area or mass concentration of lead in excess of levels determined by the Administrator under this subchapter to pose a threat of adverse health effects in pregnant women or young children." Section 2681(12) defines "lead-contaminated soil" as "bare soil on residential real property that contains lead at or in excess of the levels determined to be hazardous to human health by the Administrator under this subchapter." Congress made no mention of economic or market factors in any of its definitional provisions of sources of harm.

The EPA's duty in defining the hazards as described in Sections 2683 and 2681(10) concerns identifying the dangers of lead-based paint in order to protect health. The EPA, however, in identifying the hazards, has looked to other factors, including feasibility and efficacy. These are practical considerations bearing on implementation of the hazard standards, not the identification of the hazards to health. The TSCA IV deals separately with identification and implementation. Other parts of the TSCA IV address how the standards should be implemented and expressly take into account practical considerations, such as efficacy. *See, e.g.*, 15 U.S.C. § 2682(a)(1) Lead-based paint activities training and certification ("[T]he Administrator shall . . . promulgate final regulations . . . [which shall] contain standards for performing lead-based paint activities, taking into account

reliability, effectiveness, and safety."). Section 2681(10) deals only with identifying the hazards.

Congress has used this identification versus implementation dichotomy before. In the Clean Air Act (CAA), Congress told the EPA to set primary ambient air quality standards to protect the public health. The standards were to be set at levels "the attainment and maintenance of which . . . are requisite to protect the public health" with "an adequate margin of safety." 42 U.S.C. § 7409(b)(1). Other sections of the CAA deal with implementing the air quality standards and explicitly instruct the EPA to consider non-health factors such as achievability and cost. *See, e.g.*, 42 U.S. C. §§ 7411(a)(1), (b)(1)(B) (The EPA is charged with setting standards of performance for sources of air pollution that take into account achievability and cost); 42 U.S.C. § 7545(k)(1) (The EPA is charged with creating requirements for reformulated gasoline based in part on cost and achievability). The pattern is the same as in the TSCA IV.

Indeed, the Supreme Court has actually considered whether this CAA standard identification provision allows the EPA to consider costs in setting clean air standards and held that it does not. *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 467–468 (2001). There, the industry defendants argued that use of phrases like "adequate margin" and "requisite to protect," used to describe the regulatory goal, gave the EPA the discretion to look to non-health factors in setting the standards. Justice Scalia's opinion for the Court said it was "implausible that Congress would give to the EPA through these modest words the power to determine whether implementation costs should moderate national air quality standards." *Id.* at 467.

In so concluding, the Court recognized the distinction Congress had drawn in the CAA between identification of standards and implementation. The defendants in *Whitman* challenged the EPA's exclusion of implementation costs as resulting in standards that were too stringent. *Id.* at 467. They predicted that it could have dire implications, like "closing down whole industries." *Id.* The Court responded that economic factors were not to be considered in setting the standards because other sections of the CAA explicitly allow the EPA to consider costs. *Id.* at 467.

Congress has also used the identification and implementation dichotomy in the Resource Conservation and Recovery Act (RCRA). *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 449 (D.C. Cir. 2018) (citations omitted). The RCRA instructs the EPA to classify sanitary landfills only "if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility." 42 U.S.C. § 6944(a). When industry petitioners argued that the "no reasonable probability" phrase implied that the EPA needed to consider costs in this classification program, the D.C. Circuit pointed to the fact that other sections of RCRA told the EPA to consider costs to conclude that it was "far from clear that the EPA could consider costs even if it wanted to." *Util. Solid Waste Activities Grp.*, 901 F.3d at 448–449 (citing 42 U.S.C. § 6982(n)(6)).

In this case, the EPA argues that a literal interpretation of the text, requiring the EPA to set a threshold level of harm in looking only to health risks, no longer makes sense because we now know that all levels of lead are harmful to human health and that the EPA, acting on its own, cannot eliminate lead risks. We agree the EPA cannot do it alone, but that

does not absolve it of the statutory duty to pursue that goal, much less grant it the authority to take into account extraneous factors. As the Supreme Court has said, the EPA "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014). In our case, this means that if Congress wanted to grant the EPA the discretion to determine what it believes should be the allowable level of adverse health risks, Congress would have made that clear, and would not have buried it in a vague delegation of regulatory authority. As the Court put it in *Whitman*, 531 U.S. 457, 468 (2001), Congress does not "hide elephants in mouseholes."

Moreover, when the EPA promulgated the paint-lead hazard standard in 2001, the EPA itself took a strict interpretive approach to defining hazards to health and embraced the "identification versus implementation" distinction. It observed then that any level of lead in paint was a health risk, so it designated the presence of any lead paint as a hazard. The EPA pointed to comments indicating "that even very tiny amounts of deteriorated lead-based paint are sufficient in certain circumstances to result in adverse health effects." 66 Fed. Reg. 1206, 1208 (Jan. 5, 2001). These comments supported the EPA's decision to designate "any amount of deteriorated paint as a lead-based paint lead hazard." *Id.* The EPA explained that while implementation provisions allowed for other considerations, identification of the hazard level should encapsulate all levels of risk to health. *Id.*

The 2019 Rule lowers the lead hazard level but not to a level sufficient to protect health as Congress has directed, because the EPA has looked to factors in addition to health.

The EPA's interpretation of its statutory authority is contrary to the statutory language and express congressional purpose, as well as the Supreme Court's interpretation of parallel language in other statutes and the EPA's own prior interpretation of this provision. For these reasons, while we do not vacate the DLHS, which makes some improvement, the EPA must reconsider the DLHS.

## B. Lead-Based Paint Definition

In millions of older homes, lead in paint is a highly concentrated and common source of lead exposure. The CDC describes lead-based paint and lead-contaminated dust as the "most widespread and hazardous sources of lead exposure for young children." CDC, Lead in Paint, www.cdc.gov/nceh/lead/prevention/sources/paint.htm (last reviewed Nov. 24, 2020) (last visited Feb. 5, 2021). Children may be directly poisoned by chewing on surfaces with lead-paint. *Id.* Lead-paint also gets into dust in their homes. *Id.* The TSCA IV's lead-based paint hazard provision requires the EPA to identify what level of lead-based paint constitutes a paint-lead hazard. 15 § U.S.C. 2681(10). In the 2001 Regulations, the EPA defined the hazard to be "any" level of lead-based paint. 40 C.F.R. § 745.65(a)(4). The question then becomes: what is lead-based paint, that is, what is the level of lead in paint required to make it "lead-based." The definition is critical, and, to be consistent with the definition of lead-based paint hazard, it needs to encompass all levels of lead in paint that lead to adverse human health effects. Congress originally defined lead-based paint as paint with "lead levels in excess of 1.0 milligrams per square centimeter or 0.5% by weight," with the proviso that it could be at "such other level as may be established by the Administrator." 15 U.S.C. § 2681(9).

Congress defined the level in 1992. The EPA has never updated it, despite our ever-expanding knowledge of the dangers of lead. Four years ago, in issuing the Writ, we said the definition "appear[ed] to be too high to provide a sufficient level of safety" and characterized the need for a new definition as obvious and apparent. *In re A Community Voice*, 878 F.3d at 782, 785, 792. We noted then that the EPA had not disputed the finding that, based on modern science, its definition of lead-based paint was insufficient. *Id.* at 782. We held that the EPA's then eight-year delay was unreasonable and said that there was an urgent need for new rulemaking because of the "severe risks to children of lead-poisoning under EPA's admittedly insufficient standards." *Id.* at 788. We ordered the EPA to promulgate a new rule within one year, and to inform the court if it needed us to modify the deadline. *Id.*

Despite our clear directive, the EPA has left the definition unchanged. It blames its inaction on "significant data gaps," a justification we conclude is arbitrary and capricious. A key element of rulemaking is the collecting of relevant information. Courts have recognized that an agency cannot rely on uncertainty as an excuse for inaction.

The Supreme Court in *In Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) held that an agency may not continue to rely on uncertainty for regulatory action or inaction that evades statutory duties. The Court recognized that "policymaking in a complex society must account for uncertainty," but explained that "does not imply that it is sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions." *Id.* at 52.

The D.C. Circuit recognized the same principle in *Nat'l Ass'n of Broadcasters v. F.C.C.*, 740 F.2d 1190, 1210 (D.C. Cir. 1984) when it said "an agency would be paralyzed if all the necessary answers had to be in before any action at all could be taken." Our court echoed the Supreme Court's directive in the environmental context. *See Greater Yellowstone Coalition, Inc.*, 665 F.3d 1015. There, the U.S. Fish and Wildlife Service contended there was not enough information about a declining food supply to support keeping Yellowstone Grizzly Bears listed as "threatened" under the Endangered Species Act. *Id.* at 1019, 1028. We cited *State Farm* in concluding "[i]t is not enough for the [agency] to simply invoke 'scientific uncertainty' to justify its action." *Id.* at 1028. We said agencies have to provide reasons why uncertainty justifies their actions, lest the actions be deemed arbitrary and capricious. *Id.*

In this case, the EPA has not explained why uncertainty justifies its decision to leave the definition of lead-paint as-is. The EPA partially justifies its inaction by citing to gaps in the scientific literature, when we said four years ago the need to act was urgent.

We have gained much knowledge since Congress adopted the 1992 definition of lead-based paint; there is no safe level of lead exposure. The CDC has been telling us this for years. CDC, Health Effects of Lead Exposure, www.cdc.gov/nceh/lead/prevention/health-effects.htm (last reviewed Jan. 7, 2020) (last visited Feb. 5, 2021); *see In re A Community Voice*, 878 F.3d at 782.

The Consumer Product Safety Commission (CPSC) has taken action to protect consumers from lead by adopting a standard much more protective than the EPA's outdated

standards. The CPSC's regulation bans the production of paint with a lead content of over 0.009 percent by weight, declaring it "hazardous." 16 CFR § 1303.1(a). Under the EPA's definition, lead-paint is not hazardous until it is over fifty-five times higher than the CPSC's definition.

The EPA's responsibility here is apparent from Congress's purpose in amending the TSCA. 42 U.S.C. § 4851(a)(1). We have characterized the agency's duty as "ongoing." *In re A Community Voice*, 878 F.3d at 784. It has to account for new information and "modify initial standards when necessary to further Congress's intent" which was to "eliminat[e] lead-based paint hazards." *Id.* at 784. The EPA's failure to do so, despite the clear body of evidence commanding a new definition, violates the TSCA IV. In addition, its failure to provide any sensible explanation for its delay makes the inaction arbitrary and capricious.

## C. Soil-Lead Hazard Standards

Lead infiltrates America's soil through residue from lead-based paint, leaded fuels, and other industrial sources. For American children, who should be able to play safely in their neighborhood yards, lead in soil is particularly dangerous. While playing outside, children ingest, touch, and inhale lead from soil. CDC, Lead in Soil, www.cdc.gov/nceh/lead/prevention/sources/soil.htm (last reviewed Nov. 24, 2020) (last visited Feb. 5, 2021). Lead from soil also gets into homes through dust. In the TSCA IV, Congress charged the EPA with setting the soil-lead hazard standards in order to identify the level at which lead in soil becomes dangerous to human health. 15 U.S.C. § 2681(10).

The soil-lead hazard standards we have now were set by the EPA in 2001. They apply to lead in "bare soil" at residential properties and child-occupied facilities; they identify a "hazard" whether there is a total of 400 parts per million (ppm) ($\mu$g/g) of lead in a play area or an average of 1,200 ppm in the rest of the yard. 40 C.F.R. § 745.65(c). The EPA has not considered updating these since 2001.

The EPA's antiquated definition of soil-lead hazard standards allows for up to five percent of children to develop a blood lead level above the 2001 level of concern, which was set at 10 $\mu$g/dL. The EPA believed at the time that this would leave ninety-five percent of children with safe levels of lead in their blood (levels below 10 $\mu$g/dL). The EPA now acknowledges there is no safe level of lead in blood. It follows then, that the EPA's existing soil-lead hazard standards do not identify all levels of lead in soil that are dangerous to human health. This is contrary to the TSCA IV.

The EPA's main explanation for leaving out the soil-lead hazard standards in the 2019 Rule is that revision of those standards was not within the scope of the 2009 Petition for rulemaking. It is within the scope of the EPA's statutory obligations, however. The statute places an "ongoing" duty on the EPA to update standards "when necessary to further Congress's intent." *In re A Community Voice*, 878 F.3d at 784 (citing 15 U.S.C. § 2681). The statutory authority to amend, and the EPA's statutory duty to promulgate hazard standards sufficient to protect human health, have remained constant. It is not the public's duty, nor is it the court's duty, to notify the EPA when it should do its job.

The EPA also relies to some extent on scientific uncertainty as an excuse for its decision to ignore the

outdated soil-lead hazard standards. This is the same reason the EPA gave for not taking any action with respect to the definition lead-based paint. As we pointed out earlier in addressing that failing, the EPA cannot simply recite "scientific uncertainty" to evade its statutory duty to update regulations. *See, e.g.*, *Greater Yellowstone Coalition, Inc.*, 665 F.3d 1019. The agency must explain why the uncertainty justifies the inaction. It has provided no such explanation.

For these reasons, the EPA's decision to abandon the soil-lead hazard standards for the last two decades violates TSCA IV.

## II. Dust-Lead Clearance Levels

The dust-lead clearance levels are contained in the only regulation before us that has been promulgated pursuant to the EPA's implementation authority. The TSCA's principal provision on implementation charges the EPA with promulgating regulations governing lead-based paint, including "risk assessment, inspection, and abatement activities," while "taking into account reliability, effectiveness, and safety." 15 U.S.C. § 2682(a)(1).

Dust-lead clearance levels represent the maximum amount of lead in dust allowable in order for an abatement to be considered successful. 40 C.F.R. § 745.227(e)(8)(viii). The clearance levels are thus directly related to the level at which lead dust is a health risk (DLHS). In its 2001 abatement regulations, the EPA established clearance levels that matched the 2001 DLHS of 40 and 250 $\mu g/ft^2$ for floors and windowsills, respectively. *Id.* This meant that an abatement was successful only if it eliminated the dust hazards.

In the 2019 Rule the EPA lowered the DLHS but did not even consider the associated clearance levels. The EPA established a separate rulemaking proceeding to establish new clearance levels, a proceeding unrelated to this Rule and hence detached from the DLHS rulemaking. This would appear to ignore the close relationship between DLHS and the associated clearance levels.

In setting hazard standards, including the DLHS, the TSCA IV refers only to health as a factor to be considered. 15 U.S.C. § 2681(10). With respect to implementation, including abatement, the TSCA IV gives the EPA latitude to consider "reliability, effectiveness, and safety." *Id.* § 2682. This is in line with the overall statutory scheme that differentiates between identification of hazards and implementation of remedial measures. As we have previously described here, and the Supreme Court has discussed in a different context in *Whitman*, the EPA has more discretion in setting the clearance levels because they concern implementation of remedial measures, rather than identification of a hazard.

This does not mean, however, that the EPA has the discretion to do nothing with respect to implementation when it changes the hazard standard. Implementation must account for "reliability, effectiveness, and safety." *Id.* § 2682(a)(1). There is a broad grant of authority to update the regulations. *See* 15 U.S.C. § 2687 ("The regulations may be amended from time to time as necessary."). It follows, then, that a change in the definition of a hazard—here, the lowering of the DLHS—demands reconsideration of the effectiveness and safety of the associated abatement regulation. Because the hazard standards and the clearance levels are interrelated, the two should be considered together. As Petitioners correctly

point out, lowering the DLHS to make it a stricter standard has little effect if the clearance levels remain the same or embody less than a commensurate adjustment.

Consistent with our holding in this opinion that the EPA must reconsider the DLHS, we direct the EPA to reconsider the clearance levels as well in the same proceeding. Both sets of standards must work together to effectuate Congress's intent to end the hazards of lead poisoning in our children.

## CONCLUSION

The 2019 Rule before us is **REMANDED** without **VACATUR**.

N.R. Smith, Circuit Judge, dissenting:

The United States Environmental Protection Agency ("EPA") is not charged by Congress to set lead-dust hazard standards to eliminate *any* adverse human health effects. Instead, Congress charged EPA to consider *all* factors (including environmental, economic, social, and health) in setting the lead-dust hazards standards. Following Congress's mandate and in accordance with our 2017 Writ, EPA enacted its 2019 Rule. EPA acted within its discretion in lowering the dust-lead hazard standard ("DLHS"), which standard was reasonable and supported by the administrative record.[1]

---

[1] I agree with the majority that the lead-based paint definition and dust-lead clearance levels were included in the 2009 rulemaking petition and the 2017 Writ. The Writ required EPA to reevaluate them in its

Further, EPA's decision not to include the soil-lead hazard standards in the 2019 Rule was not arbitrary and capricious or in violation of the 2017 Writ.

Ignoring rules of statutory construction and our standard of review for EPA actions, the majority reaches its decision as to these issues.  Accordingly, I must dissent.

## I. EPA is not charged by Congress to set lead-dust hazard standards to eliminate *any* adverse human health effects.

This issue is premised on the following undisputed facts: (1) there is no safe level of lead exposure.  (2) Congress has never set the acceptable levels of lead exposure nor has it ever enacted any federal law (beyond those directed at the Department of Housing and Urban Development ("HUD")) requiring remediation of lead-based paint hazards when they are found.  Instead, (3) Congress gave EPA discretion to determine the acceptable levels for lead-based paint hazards. Pursuant to such authority, EPA has determined the appropriate lead-exposure levels based on its expertise. However, (4) because the levels presently set are unsatisfactory to Petitioners (and now the majority), they

---

rulemaking.  With regard to the definition, EPA was not necessarily required to change the definition, rather, it was only required to research and evaluate the definition.  However, the evaluation was insufficient with EPA only stating that there were "significant data gaps."   *Cf. Massachusetts v. EPA*, 549 U.S. 497, 534 (2007) ("If the scientific uncertainty is so profound that it precludes EPA from making a reasoned judgment . . . , EPA must say so.").  With regard to the dust-lead clearance levels, EPA should have included them in the 2019 rulemaking.  However, on December 18, 2020, EPA issued a final rule revising the clearance levels.

request we rewrite statutes and enlarge the 2017 Writ, in an effort to substitute their opinions and expertise as to what comprises lead-based paint hazards for that of EPA. To get to Petitioners' desired result as to this issue, the majority writes this opinion, ignoring rules of statutory construction and the standard of review. An examination of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601–2697, as amended by the Residential Lead-Based Paint Hazard Reduction Act ("RLBPHRA"), 42 U.S.C. §§ 4851–4856, reveals how the majority "cherry-picked" language to support its conclusion.

## A. *History of Lead Laws.*

To give you context, I must begin with the statutory background of the TSCA and the RLBPHRA. In 1976, the TSCA was enacted "to prevent unreasonable risks of injury to health or the environment associated with the manufacture, processing, distribution in commerce, use, or disposal of chemical substances." *Safer Chemicals, Healthy Families v. EPA*, 943 F.3d 397, 406 (9th Cir. 2019) (quoting S. Rep. No. 94-698, at 1 (1976), *reprinted in* 1976 U.S.C.C.A.N. 4491, 4491).

In 1992, recognizing that lead poisoning was still widespread, *see* 42 U.S.C. § 4851(1), Congress enacted RLBPHRA (Title X), which amended the TSCA "by adding Title IV entitled 'Lead Exposure Reduction.'" *Nat'l Multi Hous. Council v. EPA*, 292 F.3d 232, 232 (D.C. Cir. 2002). The RLBPHRA "directs EPA and [HUD] to take various actions to protect the public from any lead-based paint hazard by reducing such hazard." *Id.* The goal of the RLBPHRA was to "develop a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing

as expeditiously as possible" and to "educate the public concerning the hazards and sources of lead-based paint poisoning and steps to reduce and eliminate such hazards." 42 U.S.C. § 4851a(1), (7).

However, its enactment was "not intended to 'solve' the vast problem of childhood exposure to hazardous amounts of lead," but rather it "intended to provide a transition to support more effective strategies for *eventually* eliminating lead-based paint hazards in housing as a source of childhood lead poisoning. As a transition bill, Title X attempts to remove all major obstacles to progress, making important changes in approach and laying the foundation for more cost-effective and widespread activities for reducing lead-based paint hazards."[2] S. Rep. 102-332, 111 P.L. 102-550 Housing and Community Development Act of 1992 (July 23, 1992) (emphasis added).

**B.** ***The statutory text of TSCA and RLBPHRA require EPA to consider all (health and nonrisk) factors in enacting regulations.***

The statutory text of the TSCA and the RLBPHRA clearly indicates that Congress expected EPA to consider a variety of factors in setting the levels for lead-based paint hazards; it never expected or required EPA to set lead-based paint

---

[2] Congress enacted its first lead-based paint legislation in 1971. 42 U.S.C. § 4851(7). Despite the knowledge of harm lead causes, Congress did not require testing and abatement for all target housing occupied by children under 6. Instead, Title X only requires that lead-based paint hazards be disclosed. *See* 42 U.S.C. § 4852d(a)(1). Thus, it is clear that Congress's stated goal of "eliminat[ing] lead-based paint hazards in all housing as expeditiously as possible" intended to take non-health risk factors into account. § 4851a(1).

hazards to have zero health risk. *See* 42 U.S.C. § 4851a(2), (3), (5), (6) (outlining the purpose of Title X is to "reduce lead-based paint hazards in the Nation's housing stock"; "establish[] a workable framework for lead-based paint hazard evaluation and reduction"; "develop the most promising, cost-effective methods for evaluating and reducing lead-based paint hazards"; and "reduce the threat of childhood lead poisoning in housing owned, assisted, or transferred by the Federal Government"). Rather Congress, recognizing that complexities of reducing lead-based paint hazards, enacted statutes to provide EPA the discretion to promulgate regulations to facilitate the *reduction* of lead-based paint hazards as necessary. *See* 15 U.S.C. §§ 2601, 2681, 2683, 2685, 2687.

To determine the intent of Congress in enacting the TSCA and RLBPHRA, we "begin, as always, with the language of the statute." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 958 (9th Cir. 2013) (quoting *Duncan v. Walker*, 533 U.S. 167, 172 (2001)). Words are "interpreted as taking their ordinary, contemporary, common meaning," "[b]ut [w]hen a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Id.* (citations and quotation marks omitted). "[B]ecause words necessarily derive meaning from their context, interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Id.* (alteration and quotation marks omitted) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)). "Reviewing the whole statutory scheme is particularly important for a law such as [TSCA and RLBPHRA], which [are] complex regulatory statute[s] . . . ." *See id.*

In cases of statutory interpretation, our role "is to construe the language so as to give effect to the intent of Congress." *United States v. American Trucking Ass'ns*, 310 U.S. 534, 542 (1940). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Here, Congress's intent is clear, and EPA properly enacted regulations following Congress's intent.

A deeper examination into the enabling statutes of the TSCA and RLBPHRA all demonstrate Congress's clear intent: EPA must consider factors beyond health when promulgating regulations under Title IV. To begin, § 2683 provides EPA the authority to set the lead-based paint hazard levels, and the related statutes provide EPA with the factors it may consider in setting those levels.

### 1. § 2683

Section 2683 mandates that EPA "promulgate regulations which shall identify, for purposes of [Title IV] and [Title X], *lead-based paint hazards*, *lead-contaminated dust*, and *lead-contaminated soil*." *Id.* (emphasis added). Put simply, EPA was required to identify "lead-based paint hazards" in order administer the TSCA and RLBPHRA. The language of § 2683 does not limit EPA's discretion in identification of the hazards. For certain, nothing in § 2683 itself limits EPA's discretion to consider only adverse heath factors in identifying the hazards. To the contrary, "when Congress does not say how to take costs [or other nonrisk factors] into account, agencies have broad discretion to make that judgment." *Michigan v. EPA*, 576 U.S. 743, 785 (2015)

(Kagan, J., dissenting). "Far more than courts, agencies have the expertise and experience necessary to design regulatory processes suited to 'a technical and complex arena.'" *Id.* (quoting *Chevron*, 467 U.S. at 863). In carrying out the Congressional mandate of § 2683, EPA has used its expertise and experience to establish appropriate levels of lead-based paint hazards that take into account Congress's goal of risk reduction but also considering barriers to implementing those standards and prioritized protection.

The majority reads the statute and (out of thin air) limits the definitions of "lead-based paint hazard," "lead-contaminated dust," and "lead-contaminated soil" to conclude that EPA's discretion was limited to considering only *health effects* when it promulgated the regulations under § 2683. Maj. Op. 15–17. This interpretation violates the "fundamental canon of statutory construction": "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 492 (2015) (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014)). The definitions (upon which the majority relies) do not statutorily foreclose EPA from considering nonrisk factors in promulgating regulations under § 2683. To the contrary, § 2683 is silent with regard to this issue.[3] However, the statutory scheme and the specific language of related statutes all lead to EPA having discretion to set levels with consideration of all factors, including nonrisk factors.

---

[3] Even if interpretation of § 2683 and § 2681 were read in isolation, "the statute is silent or ambiguous as to the issue at hand." *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1218 (9th Cir. 2015). Thus, we would then have to "defer to the agency's reading so long as its interpretation is a reasonable one." *Id.*

## 2.  § 2601(c)

The Sixth Circuit correctly determined that the "TSCA was enacted with the Congressional intent that EPA be permitted to 'carry out this chapter in a reasonable and prudent manner and . . . consider the environmental, economic, and social impact of any action' it takes or intends to take." *Lockett v. United States*, 938 F.2d 630, 636 (6th Cir. 1991) (alteration in the original) (quoting 15 U.S.C. § 2601(c)).  Thus, Congress mandated that EPA identify "dangerous levels of lead," taking into consideration both health and nonrisk factors in its proposed regulations, which EPA properly did.  *See* 15 U.S.C. §§ 2601(c), 2683.

Other sister circuits have similarly concluded that § 2601(c) applies to EPA's promulgation of regulations under the TSCA.  *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039 (D.C. Cir. 2012); *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1222 (5th Cir. 1991); *Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344, 348 n.5 (5th Cir. 1990); *Ausimont U.S.A. Inc. v. EPA*, 838 F.2d 93, 95 (3d Cir. 1988). Importantly, the D.C. Circuit applied § 2601(c) to Title IV, specifically in relation to § 2682.  It noted:

> The TSCA was passed in 1976 with the following preface: "It is the intent of Congress that the Administrator shall carry out this chapter in a reasonable and prudent manner, and that the Administrator shall consider the environmental, *economic*, and social impact of any action the Administrator takes or proposes to take under this chapter." 15 U.S.C. § 2601(c) (emphasis added). Although the TSCA thus "expressly requires

the Administrator to consider" the "economic consequences" of action taken under the Act, *Envtl. Def. Fund v. EPA*, 636 F.2d 1267, 1276 (D.C. Cir. 1980), this does not mean that the regulation's benefits must outweigh its costs.

*Nat'l Ass'n of Home Builders*, 682 F.3d at 1039. The D.C. Circuit recognized that § 2682(a)(1) also required that the promulgated "regulations shall contain standards for performing lead-based paint activities, taking into account reliability, effectiveness, and safety." *Id.* ("Indeed, when Congress amended the TSCA in 1992 to authorize regulations addressing lead-paint hazards, it instructed EPA to "tak[e] into account reliability, effectiveness, and safety"—but did not mention cost."). Accordingly, the court concluded that this additional language did not alter EPA's duty to take costs into consideration nor did it require EPA conduct a cost-benefit analysis. *Id.* at 1039–40. Here, by contrast, § 2683 does not mention any of the § 2601(c) factors, nor does it contain any limiting language that would alter § 2601(c)'s mandate. Further, § 2681(10) does not mention "environmental, economic, and social impact[s]," thus, EPA's duty to consider these factors remain. *See Nat'l Ass'n of Home Builders*, 682 F.3d at 1039. As our sister circuits all have concluded, the language of § 2601 is clear and applies to the promulgation of regulations under Chapter 53, which includes § 2683.

Congress's mandate that § 2601(c) is applied throughout Chapter 53 is clear and unambiguous. Nowhere in either Title IV or Title X is there any language limiting EPA to consider only health-risk factors in promulgating regulations under § 2683. Although the definition sections reference health effects for purposes of defining the term, they do not

preclude EPA from using its discretion in setting hazardous levels in consideration of § 2601(c). To the contrary, if that were the case, then EPA would seemingly have to set all of the clearance levels at 0 µg/ft2, because there is no safe level of lead exposure. *Cf.* 42 U.S.C. § 300g-1, 40 C.F.R. § 141.51 (setting maximum contaminant level *goal* for lead at zero).

Further, if Congress wanted to limit EPA's consideration of nonrisk factors, it could have excluded environmental, economic, and social impacts from EPA's consideration. *See, e.g.*, § 2605(b)(4) (conducting risk evaluations "without consideration of cost or other nonrisk factors"). However, Congress chose not to limit EPA's consideration of § 2601(c) factors in either § 2681(10) or § 2683. Thus, we must give effect to Congress's clear intent for EPA to consider both health and nonrisk factors. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

The majority mistakenly disregards § 2601(c) in the interpretation of Title IV without explanation. *See Setser v. United States*, 566 U.S. 231, 239 (2012). Its clear statement of intent should be used "to assist in ascertaining the intent and meaning of a statute fairly susceptible of different constructions." *Price v. Forrest*, 173 U.S. 410, 427 (1899); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 218 (2012) (explaining that "[i]f a prologue is indeed an appropriate guide to meaning, it ought to be considered along with all other factors in determining whether the instrument is clear. The factors

undermining its reliability affect its weight, not its relevance").

Petitioners' challenges to the application to § 2601 to § 2683 have no merit. First, Petitioners argue that 2601(c) "refers only to the cradle-to-grave regulation of 'chemical substances and mixtures' in commerce—the subject of TSCA Title I." This argument fails to explain why Congress used the phrase "this chapter" rather than "this subchapter" if it meant to limit § 2601(c) to Title I. *See Foxgord v. Hischemoeller*, 820 F.2d 1030, 1032 (9th Cir. 1987) ("It is a maxim of statutory construction that unless otherwise defined, words should be given their ordinary, common meaning."). Additionally, other sections of Title I apply throughout the entire chapter. Petitioners do not explain why § 2601 would apply differently than (a) § 2627, implementing state programs; (b) § 2618, judicial review (which we invoke here); or (c) § 2620, allowing a citizen petition (which was used by Petitioners to get here in the first place).

Second, Petitioners cite to *Charter Township of Van Buren v. Adamkus*, 10 F. Supp. 2d 766, 770 (E.D. Mich. 1998), for the proposition that § 2601(c) is "not an operative section."[4] Unlike the "findings" and "policy" provisions in § 2601 addressed there, this statement of Congressional intent "create[s] an enforceable mandate for some additional

---

[4] Assuming that this decision does not conflict with *Lockett*, 938 F.2d at 636, "[l]egislative history cannot trump the statute." *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 920 (9th Cir. 2005). Further, the legislative history does states that this "section of the bill is not an operative section," however, it further states that "the intent of Congress as stated in this subsection should guide each action the Administrator takes under other sections of the bill." S. Rep. 94-698, at 14 (1976), *reprinted in* 1976 U.S.C.C.A.N. 4491, 4504.

procedural step."[5]  *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 987 (9th Cir. 2015) (citation omitted); *see also Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 569 (3d Cir. 2002) ("[W]e generally assume that the best evidence of Congress's intent is what it says in the texts of the statutes.").

Finally, Petitioners argue that § 2605(b)(4) and § 2605(c)(2) allow EPA to ignore § 2601(c) and only consider health factors.  Although § 2605(b)(4) requires EPA to conduct "risk evaluations" "without consideration of costs or other nonrisk factors," § 2605(c)(2)(A) requires EPA to "consider and publish a statement" with respect to the health, environment, and nonrisk factors in "proposing and promulgating a rule." *See also* § 2605(c)(2)(B) ("In selecting among prohibitions and other restrictions, the Administrator shall factor in, to the extent practicable, the considerations under subparagraph (A) in accordance with subsection (a)."). Thus, these sections do not support Petitioners' argument that § 2601 does not apply.[6]

---

[5] The majority does not address the application of § 2601(c) to Title IV.  The majority undoubtably would not assert that § 2601(c) is non-operative, because the majority itself (now and previously) relies upon the non-operative statutes, 42 U.S.C. §§ 4851 (findings), 4851a (purposes), to determine Congress's intent.  *See In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017); *see also* Maj. Op. at 12, 15, 23.

[6] Petitioners argued at oral argument that § 2601(c) did not apply to § 2683, and that *National Association of Home Builders* was distinguishable because (1) the court found that it did not have to rely solely upon a cost-benefit analysis in promulgating its regulations and (2) § 2682 was distinguishable from § 2683, because § 2682 allowed EPA to take into consideration "reliability, effectiveness, and safety."  These arguments fail.  First, the D.C.'s Circuit's conclusion that EPA need not conduct a cost-benefit analysis does not mean that EPA cannot consider, in a "reasonable and prudent manner," "the environmental, economic, and

### 3.  § 2681(10)

Section 2681(10) establishes that EPA also has discretion in setting a standard that "*would result* in adverse health effects." We start with the statutory language:

> The term "lead-based paint hazard" means any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, lead-contaminated paint that is deteriorated or present in accessible surfaces, friction surfaces, or impact surfaces that would result in adverse human health effects *as established by the Administrator under this subchapter*.

15 U.S.C. § 2681(10) (emphasis added). When "a list of terms or phrases [are] followed by a limiting clause," we generally apply the "rule of last antecedent." *Lockhart v. United States*, 136 S. Ct. 958, 962 (2016). "The rule reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it." *Id.* at 963. Thus, applying the rule here the clause would only modify "*would result* in adverse human health effects." *See id.* at 962–63. It is then clear that Congress intended EPA to exercise its discretion in setting hazard standards, and that discretion included a level of certainty that adverse human health effects would occur. *See*

---

social impact" of its proposed regulations. *See Nat'l Ass'n of Home Builders*, 682 F.3d at 1039 (quoting 15 U.S.C. § 2601(c)). Second, the fact that § 2682 allowed EPA to consider other discretionary factors, does not alter how § 2601(c) should apply equally to "*any* action" taken under Title IV of the TSCA. *See* § 2601(c) (emphasis added).

*Nat'l R.R. Passenger Corp. v. Bos. & Maine Corp.*, 503 U.S. 407, 417 (1992) ("Judicial deference to reasonable interpretations by an agency of a statute that it administers is a dominant, well-settled principle of federal law.").

The majority mistakenly asserts that § 2681(10) "requires the EPA to identify '*any condition*' of lead in dust, paint, and soil resulting in adverse human health effects." Maj. Op. 10 (emphasis added). In order to reach this conclusion, the majority improperly applies the rule of last antecedent to conclude that "as established by" EPA modifies "any condition." Then, the majority uses Congress's goal "to develop a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible," 42 U.S.C. § 4851a(1), as the basis to conclude that "[t]he natural reading is that the delegation to the EPA is to establish *the conditions that cause harm*, not what constitutes harm," Maj. Op. 15. However, Congress's stated goal to "eliminate lead-based pain hazards" does not overcome the rule of the last antecedent.[7] Although "the rule of the last antecedent 'is not an absolute and can assuredly be overcome by other indicia of meaning,'" it should not be "a heavy lift to carry the modifier across" the

---

[7] The majority interprets § 2681(10) based on Congress's stated purposes. *See* Maj. Op. 15 (citing 42 U.S.C. § 4851a(1)). However, Congress's stated goals should not be used to justify ignoring clear congressional intent and imposing unmandated requirements on the agency. *See Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 178 (D.C. Cir. 1982) ([I]t is one thing for Congress to announce a grand goal, and quite another for it to mandate full implementation of that goal."). Further, Congress understood that to reach the goal of lead-based-paint-hazard elimination *in all housing*, development of the "most promising, cost-effective methods for evaluating and reducing lead-based paint hazards" was necessary. § 4851a(5).

"individual entries in the list." *See Lockhart*, 136 S. Ct. at 963 (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). The majority's reading is not only a "heavy lift," it also ignores other indicia of meaning within the statutory scheme (as discussed), supporting EPA's discretion to identify what constitutes harm.

To further support application of the "rule of the last antecedent" to § 2681(10), the definitions of lead-contaminated dust and lead-contaminated soil contain similar modifiers and are interpreted in this same manner. First, "lead-contaminated dust" is "surface dust in residential dwellings that contains an area or mass concentration of lead in excess of levels *determined by the Administrator under this subchapter* to pose a threat of adverse health effects in pregnant women or young children." § 2681(11) (emphasis added). Second, "lead-contaminated soil" is "bare soil on residential real property that contains lead at or in excess of the levels *determined to be hazardous to human health by the Administrator under this subchapter*." § 2681(12) (emphasis added).

The majority does not try to reconcile the application of the modifier in the sections. The majority provides no reasonable explanation why § 2681(10) should not be similarly interpreted by the rule of last antecedent.[8]

---

[8] Further complicating the application of these definitions is Congress's inclusion of three different standards for EPA to consider in determining the safe levels of lead—(1) "would result in adverse human health effects," § 2681(10); (2) "pose a threat of adverse health effects in pregnant women or young children," § 2681(11); and (3) "determined to be hazardous to human health," § 2681(12). The definition of "lead-based paint hazard" includes lead-contaminated paint, lead-contaminated dust, and lead-contaminated soil. The majority ignores the fact that there are

Interpreting § 2681(10) (as Congress intended) makes it clear that EPA was given discretion to determine the levels that "*would result* in adverse human health effects."[9]  And (as previously noted) Congress did not intend nor did it require that EPA set the level at zero; rather, it allowed EPA, based on its expertise, to determine levels based on "environmental, economic, and social impact."[10]  *See* § 2601(c).

---

three different standards (including references to "human health" versus "pregnant women or young children"), referencing instead that the standard is a "danger to human health" or a "hazard to human health." *See, e.g.*, Maj. Op. 14.  Given that the statute is ambiguous with regard to how EPA should assess the human health effects when promulgating the regulations, EPA should be given discretion.  *Chevron*, 467 U.S. at 843.

   [9] Congress use of the word "would" is also telling and suggests some certainty of harm.  By contrast, Congress has required the administrator consider pollutants that present "a threat of adverse health effects." *See* 42 U.S.C. § 7412(b)(2).  Thus, here, Congress chose not to require EPA set standards with lower levels of certainty.

   [10] The majority claims that the "current dust-lead hazard standards, lead-based paint definition, and soil-lead hazard standards do not identify all levels of lead that lead to adverse health effects." Maj. Op. 7.  It is not clear how the majority or Petitioners want EPA to determine the "safe" levels.  EPA set the new standards to the levels originally requested by the Petitioners.  Yet now, Petitioners assert it is too high, arguing (contrary to their 2009 Petition) that they effectively were not aware that there was no safe level of lead exposure until the CDC's 2012 report.  Petitioners also point out that a 5 μg/ft2 of dust on floors and 40 μg/ft2 on windowsills ("5/40 Standards") would still result in 2.5 percent of children developing a blood lead level above 5 μg/dL.  Given that there is no safe level of lead exposure, it seems that EPA has few options in setting a standard that would be or will be acceptable to the majority and Petitioners.

### 4.  § 2682(a)(1) & § 2685(a)

The application of both §§ 2682 and 2685 affirm that Congress intended EPA to consider nonrisk factors in promulgating § 2683.  As noted above, Congress required EPA to set standards for dangerous levels of lead for purposes of implementing Title IV and Title X.  In enacting lead-based paint activities, § 2682, and state programs, § 2685, Congress did not allow EPA to set separate lead-contaminated dust and soil levels.  Rather, Congress mandated that EPA "shall conduct a comprehensive program to promote safe, effective, and affordable monitoring, detection, and abatement of lead-based paint and other lead exposure hazards," § 2685(a), and it should "tak[e] into account [the] reliability, effectiveness, and safety" in drafting regulations "for performing lead-based paint activities," § 2682(a)(1).

Section 2682 requires EPA set forth regulations "in consultation with the Secretary of Labor, the Secretary of Housing and Urban Development, and the Secretary of Health and Human Services"[11] governing the training, accreditation, and certification of persons engaged in lead-based activities.  Lead-based paint activities include "activities conducted by a person who offers to *eliminate* lead-based paint[[12]] or lead-based paint hazards or to plan such activities."  § 2682(b) (emphasis added).  Congress

---

[11] Consultation with other affected agencies is also required under 42 U.S.C. § 4842.  Congress's intent that the agencies work together in "carrying out their respective authorities" supports a conclusion that Congress gave discretion to the agencies to determine the proper lead-based paint hazard levels.

[12] Congress does not treat lead-based paint as a "hazard" until it has "deteriorated."  § 2681(9), (10).

requires that the regulations "contain *standards for performing* lead-based paint activities, taking into account reliability, effectiveness, and safety." § 2682(a)(1), (b)(1) (emphasis added). The standards for risk assessment, inspection, and abatement in target housing or deleading in pre-1978 structures cannot be done reliably or effectively if the underlying lead-based paint hazards levels are set so low that they are neither technologically feasible nor achievable.

Similarly, § 2685 requires EPA to create a program to promote lead exposure abatement, which includes "safe, effective, and affordable monitoring, detection, and abatement" of lead-based paint hazards. It further requires EPA to also establish protocols for the "minimum performance standards of laboratory analysis." As with § 2682(a)(1), lead-based paint hazard levels (that are set based solely on health risks) could preclude the ability to create safe, effective, and affordable monitoring and detection of lead-based paint hazards.

### 5.  § 2681(9) & 42 U.S.C. § 4822(c)

The definition of lead-based paint further confirms Congress's intent that EPA to consider nonrisk factors in setting lead-based paint hazards. This principle was emphasized in Congress's recognition that its definition of lead-based paint should not be lowered by HUD if the testing were not feasible or the medical evidence did not support it. *See* 42 U.S.C. § 4822(c) ("The Secretary shall periodically review and reduce the level below 1.0 milligram per centimeter squared or 0.5 percent by weight to the extent that reliable technology makes feasible the detection of a lower level and medical evidence supports the imposition of a lower level.").

In adopting § 2681(9), Congress provided three options for defining lead-based paint: (1) the initial threshold level for all "paint or other surface coatings that contain lead in excess of 1.0 milligrams per centimeter squared or 0.5 percent by weight" as established by Congress; (2) the established threshold level for "paint or other surface coatings on target housing,"[13] or a lower level to be established by HUD under 42 U.S.C. § 4822(c); or (3) the established threshold level for "any other paint or surface coatings" outside of target housing, or some "other level" to be established by EPA.[14] § 2681(9). There is no language to mandate how EPA would set this "other level." However, it would be nonsensical to suggest that EPA and HUD (who are mandated to work together in setting levels, *see* 42 U.S.C. § 4853a) would be required to establish the level based on different criteria.[15]

---

[13] "The term 'target housing' means any housing constructed prior to 1978, except housing for the elderly or persons with disabilities or any 0-bedroom dwelling (unless any child who is less than 6 years of age resides or is expected to reside in such housing). In the case of jurisdictions which banned the sale or use of lead-based paint prior to 1978, the Secretary of Housing and Urban Development, at the Secretary's discretion, may designate an earlier date." 15 U.S.C. § 2681(17); 42 U.S.C. § 4851b(27).

[14] If Congress wanted to change the lead-based paint definition in the TSCA and RLBPHRA, it could have. In fact, in 2008, Congress implemented a change to the "limit for lead in paint" under the Federal Hazardous Substances Act to no more than ".0009 percent." 15 U.S.C. § 1278a(f)(1). Congress also allowed the Commission to lower the limits if feasible. *Id*. at § 1278a(f)(2).

[15] Further evidence that Congress did not intend EPA and HUD to have different levels is the definition of "Inspection," which means in part "a surface-by-surface investigation to determine the presence of lead-based paint, as provided in section 4822(c) of Title 42." This definition is the same for both 15 U.S.C. § 2681(7) and 42 U.S.C. § 4851b(12).

*See Chubb Custom Ins. Co.*, 710 F.3d at 958 (explaining that we are "cautioned against following a literal interpretation of a statute that would thwart the overall statutory scheme or lead to an absurd result").

"Statutory construction is a 'holistic endeavor,'" requiring us to "look not only to the 'particular statutory language at issue' but also to 'the language and design of the statute as a whole.'"    *In re DBSI, Inc.*, 869 F.3d at 1010 (citations omitted).  For the successful implementation of Title IV and Title X, §§ 2601(c), 2681(9), (10), 2682(a)(1), 2683, 2685(a), and 42 U.S.C. § 4822(c) all establish that lead-based paint hazards must consider factors other than health.  To conclude otherwise would ignore clear Congressional intent and further lead to absurd results.

### C.  *A comparison with the Clean Air Act does not alter this analysis.*

The majority mistakenly tries to support its statutory interpretation by citing *Whitman v. American Trucking Associations*, 531 U.S. 457 (2001).  In particular, the majority argues that Clean Air Act's statutory "pattern" is the same as that found in Title IV, arguing that § 2682(a)(1) "address[es] how the standards should be implemented and expressly take[s] into account practical considerations," and that § 2681(10) "deals *only* with identifying hazards."  Maj. Op. 16–17.  However, *Whitman*'s analysis of the Clean Air Act does not control our analysis for these reasons.

*Whitman* involved a provision in the Clean Air Act that required EPA to set ambient air quality standards.  531 U.S. at 465–67.  The Supreme Court concluded that statutory language mandating EPA to set the standards at levels to

protect public health and welfare with "an adequate margin of safety," did not allow EPA to consider the costs of setting the standards. *Id.* at 465 (quoting 42 U.S.C. § 7409(b)(1)). The Supreme Court found the statutory language "absolute." *Id.* It explained that the language of the statute required "[t]he EPA, 'based on' the information about health effects contained in the technical 'criteria' documents compiled under § 108(a)(2), 42 U.S.C. § 7408(a)(2), . . . to identify the maximum airborne concentration of a pollutant that the public health can tolerate, decrease the concentration to provide an 'adequate' margin of safety, and set the standard at that level." *Id.* The Supreme Court recognized that, because costs were "so indirectly related to public health *and* so full of potential for canceling the conclusions drawn from direct health effects," Congress would have mentioned costs if they were to be included. *Id.* at 469. Additionally, "[a]ttainability and technological feasibility [were] not relevant considerations in the promulgation of national ambient air quality standards." *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1185 (D.C. Cir. 1981), *see id.* at 1190 ("[T]he question of attainability is not relevant to the setting of ambient air quality standards under the Clean Air Act.").

Title IV of the TSCA is not similar to the Clean Air Act. First, § 7409 is a promulgation statute; § 2681 is not. Second, unlike the Clean Air Act, Congress did not make any provisions within Title IV or Title X to address implementation, including a wavier to comply with the levels set by § 2683. *See Whitman*, 531 U.S. at 466. Rather, in the Clean Air Act, Congress commissioned a cost study and provided for the costs of achievement in its enactment. *Id.* Notably, Congress allowed EPA "to waive the compliance deadline for statutory sources" and allowed costs be considered "in implementing the air quality standards." *Id.*

at 466–67.  Third, nothing in Title IV or Title X suggests that Congress wanted EPA to set non-achievable "goal" standards in enacting lead-based paint hazards.  Finally, § 2601(c) "show[s] a textual commitment of authority to EPA to consider [environmental, economic, and social impacts] in [identifying dangerous levels of lead for implementation under § 2683]." *Id.* at 468.  Section 2601(c) is neither written in "vague terms" nor is it an "ancillary provision[]." *Id.*  To be sure, one cannot say that § 2601(c) (a part of the TSCA) was an "elephant[] in [a] mousehole[]." *Id.*

Unlike the Clean Air Act, the "lead-based paint activities" statute does not assign EPA or any other entity the ability to develop implementation plans for § 2683.  *See* 15 U.S.C. § 2682.  Rather, Congress mandated that EPA ensure that persons involved in the risk assessment, inspection, or abatement of lead-based paint hazards had the proper training and certifications.  § 2682(a)(1).  Nothing in § 2682 allows EPA to set lesser standards for lead-based paint hazards in the context of abatement.

The majority argues that § 2682 is a similarly situated implementation statute, because it gives EPA latitude to consider "reliability, effectiveness, and safety" in "remedial measures."  Maj. Op. 25–27.  Thus, the majority concludes that § 2862 gives EPA discretion to determine post-abatement clearance levels that take into account nonrisk factors.[16]  This

---

[16] Nowhere in Title IV or Title X does Congress suggest that EPA can enact regulations allowing for less protective "clearance levels" in the course of abatement activities.  To the contrary, the only reference to "clearance levels" is contained within the definition of abatement.  *See* § 2681(1)(B) ("[A]ll preparation, cleanup, disposal, and postabatement clearance testing activities associated with such measures [to permanently eliminate lead-based paint hazards.]").

conclusion can only be reached, based on a faulty reading of the statute.[17]  Starting with the definition of lead-based paint activities, it is unclear how the majority concludes that this section allows for different implementation standards.  Lead-based paint activities are defined as:

> (1) in the case of target housing, risk assessment, inspection, and abatement; and

> (2) in the case of any public building constructed before 1978, commercial building, bridge, or other structure or superstructure, identification of lead-based paint and materials containing lead-based paint, deleading, removal of lead from bridges, and demolition.

§ 2682(b).

It is these activities for which EPA should create "*standards for performing*" that "tak[e] into account reliability, effectiveness, and safety." § 2682(1).  Despite the majority's suggestion otherwise, this section is not limited to the "implementation of remedial measures" (i.e., abatement). Maj. Op. 26.  To be sure, not all lead-based activities are "remedial" in nature.  First, "risk assessment" is an "investigation to determine and report the existence, nature,

---

[17] This conclusion that clearance levels could be higher than the DLHS does not seem to be a position advocated by Petitioners.  To be sure, Petitioners argued that EPA's failure to revise the clearance levels was not a "permissible construction" of Title IV, "because it renders the newly adopted DLHS meaningless as homes will pass clearance even if post-abatement dust-lead is at levels considered hazardous."

severity and location of *lead-based paint hazards* in residential dwellings." § 2681(16) (emphasis added). Second, "inspection," is "a surface-by-surface investigation to determine the presence of lead-based paint." § 2681(7). Both risk assessment and inspections provide information on what, if any, actions may be taken to manage the existence of lead-based paint or lead-based paint hazards.

If either lead-based paint or lead-based paint hazards exist, abatement and deleading are possible remedial measures that may be taken. "Abatement" is "any set of measures designed to permanently *eliminate lead-based paint hazards* in accordance with standards established by the Administrator." § 2681(1) (emphasis added). And "deleading" includes "activities conducted by a person who offers to *eliminate* lead-based paint or *lead-based paint hazards* or to plan such activities." § 2682(b). Notably, the goals of abatement and deleading are only *elimination* not *reduction* of lead-based paint hazards.[18]

The majority argues that, under § 2682, EPA can set different (perhaps higher) clearance levels for lead-based paint hazards because it can consider nonrisk factors. *See* Maj. Op. 26 ("[T]he EPA has more discretion in setting the clearance levels because they concern implementation of remedial measures, rather than identification of a hazard."). Without citation to any authority, the majority interprets "clearance levels" effectively to be a "waiver" of compliance

---

[18] "The term 'reduction' means measures designed to reduce or eliminate human exposure to lead-based paint hazards through methods including interim controls and abatement." § 2681(13). Interim controls are "designed to reduce temporarily human exposure or likely exposure to lead-based paint hazards." § 2681(8).

with the DLHS. However, EPA defines clearance levels as "the maximum amount of lead permitted in dust on a surface following completion of an *abatement* activity." 40 C.F.R. § 745.223 (2020) (emphasis added). Again, abatement is designed "to permanently eliminate lead-based paint hazards" not merely reduce them. § 2681(1). Thus, applying the majority's interpretation would create a "never ending loop," wherein lead-based paint hazards may never be eliminated. For example, federally owned pre-1960 target housing "require[s] the inspection and *abatement* of *lead-based paint hazards*." 42 U.S.C. § 4822(a)(3)(A) (emphasis added). If lead-based paint hazards are set to *identification* levels at 10 µg/ft but *implementation* (clearance levels) are set at 40 µg/ft, abatement (i.e., permanent elimination) of lead-based paint hazards could not be achieved. In other words, the clearance level would suggest the abatement was successful,[19] yet lead-based paint hazards would still exist, precluding compliance with § 4288(a)(3)(A). The majority's interpretation would create an absurd result, allowing abatement of lead-based paint or lead-based paint hazards to result in higher levels of exposure.

The Resource Conservation and Recovery Act ("RCRA") also does not support the majority's reading. Congress instructed EPA to designate facilities as either "sanitary landfills" or "open dumps." 42 U.S.C. § 6944(a). Congress provided that a facility may only be classified as a "sanitary

---

[19] In setting the current clearance levels, EPA recognized that "[t]he DLHS are used to identify dust-lead hazards and the [clearance levels] are used to demonstrate that specific abatement activities have effectively and permanently eliminated those hazards." Review of Dust-Lead Post-Abatement Clearance Levels, 85 Fed. Reg. 37810-01, *37811 (June 24, 2020).

landfill" "if there is *no reasonable probability* of adverse effects on health or the environment from disposal of solid waste." *Id.* (emphasis added). The phrase "no reasonable probability" was challenged, suggesting that the phrase required EPA to consider costs. *See Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 448 (D.C. Cir. 2018). The D.C. court rejected the argument, because there was no authority for EPA to consider costs. *Id.* at 448–49.

Again the majority's reliance on RCRA to support its interpretation fails. Unlike the § 6944(a), 15 U.S.C. § 2683 is silent on how EPA promulgate regulations identifying lead-based paint hazards for the administration of Title IV and Title X. And nothing in the RCRA suggests that EPA could consider other criteria, whereas, the TSCA includes an explicit authorization to consider other factors. *See* 15 U.S.C. § 2601(c).

In summary, EPA is not "rewrit[ing] clear statutory terms," Maj. Op. 19 (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014)); the majority is. The majority refuses to interpret the statute as a whole, instead taking statutes out of context in an effort to follow *Whitman*. But "[c]ontext is a primary determinant of meaning." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012). "Statutory construction is a 'holistic endeavor,'" requiring us to "look not only to the 'particular statutory language at issue' but also to 'the language and design of the statute as a whole.'" *Zazzali v. United States (In re DBSI, Inc.)*, 869 F.3d 1004, 1010 (9th Cir. 2017) (citations omitted). If the majority considered the statute as a whole, instead of cherry picking and misinterpreting sections to help support its theory, it would conclude that Congress was clear

when it provided EPA discretion to set the level in consideration of both health and nonrisk factors.[20]

## II. EPA was not required to update soil-lead hazard standards.

In 2018, EPA summarized its proposed rule as follows:

> Addressing childhood lead exposure is a priority for EPA. As part of EPA's efforts to reduce childhood lead exposure, EPA evaluated the current dust-lead hazard standards (DLHS) and the definition of lead-based paint (LBP). Based on this evaluation, EPA is proposing to lower the DLHS from 40 µg/ft and 250 µg/ft to 10 µg/ft and 100 µg/ft on floors and window sills, respectively. EPA is proposing no changes to the current definition of LBP due to insufficient information to support such a change.

Review of the Dust-Lead Hazard Standards and the Definition of Lead-Based Paint, 83 Fed. Reg. 30889-01, *30889 (July 2, 2018) (footnotes omitted).

---

[20] The majority asserts that in 2001, EPA "embraced the 'identification versus implementation' distinction" in enacting those regulations. Maj. Op. 19. Even if this claim were true, EPA has acted consistently in enacting the regulations, considering both health and nonrisk factors. *See* Lead; Identification of Dangerous Levels of Lead, 66 Fed. Reg. 1206-01, *1231–32 (Jan. 5, 2001); *see also* Lead; Identification of Dangerous Levels of Lead, 63 Fed. Reg. 30302-01, *30313 (June 3, 1998).

The proposed rule did not address soil-lead hazard standards. EPA did not specifically request comments on soil-lead hazard standards. Instead, EPA requested comments with regard to the proposed DLHS and lead-based paint definition. *See id*. at \*30890, \*30895–97, \* 30899. In response to EPA's request, several commenters requested EPA revise the soil-lead hazard standards. EPA then responded that the soil-lead hazards standards were "not included in the proposed rule and [were] not within the scope of the rulemaking." Additionally EPA explained that soil-lead hazard standards required different studies and analyses that were separate from DLHS.

## A. *The 2017 Writ did not include soil-lead hazard standards.*

In this petition for review, Petitioners challenge EPA's final rule entitled "Review of the Dust-Lead Hazard Standards and the Definition of Lead-Based Paint." Petitioners argue that this final rule violates the TSCA by not updating the soil-lead hazard standards. Petitioners have no basis for this argument: (1) Petitioners did not request rulemaking for lead-contaminated soil in its 2009 petition. (2) The 2017 Writ did not require rulemaking for lead-contaminated soil. In granting the 2017 Writ, the majority found that EPA had a duty under the APA to engage in rulemaking for only dust level hazard standards and the definition of lead-based paint (NOT lead-contaminated soil). *A Cmty. Voice*, 878 F.3d at 785. (3) Petitioners have the burden of showing that the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Because rulemaking for lead-contaminated soil was not part of the 2009 petition nor required by our court's 2017 Writ, EPA's

decision not to address lead-contaminated soil in the 2019 rulemaking (even with an "ongoing duty"[21]) was neither arbitrary nor capricious.[22]  *See Compassion Over Killing v. U.S. Food & Drug Admin.*, 849 F.3d 849, 854 (9th Cir. 2017) ("When an agency refuses to exercise its discretion to promulgate proposed regulations, the Court's review is extremely limited and highly deferential." (internal quotation marks omitted) (quoting  *Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007))).  EPA was well within its discretion to limit the 2019 rulemaking to "fully respond to Petitioners' rulemaking petition" as directed by this court, which did not include soil-lead hazards standards.

Neither Petitioners nor the majority explain why EPA's decision not to include soil-lead hazards standards in its 2019 rulemaking violated the TSCA.  Petitioners do not claim the soil-lead hazard standards were within the scope of the rulemaking.  Instead, they assert EPA provided "no timetable" for when it would conduct analyses and assert that EPA had an obligation to address the comments to the rulemaking even if they were "outside the scope."  Neither of these arguments establish that EPA's decision was arbitrary or capricious.  The majority asserts that EPA violated its "statutory obligations" in enacting the final rule, because it

---

[21] The majority concluded in *A Community Voice* that § 2687 mandated that EPA has an "ongoing duty" to amend the regulations. 878 F.3d at 784.  Although I am bound by that decision, I continue to disagree that § 2687 mandates any action.

[22] Congress did not mandate any statutory deadline for revising regulations, leaving in EPA's discretion to amend the regulations "from time to time as necessary."  § 2687.  Because EPA has discretion to determine the acceptable levels, the fact that EPA's prior levels were set in 2001 does not clearly require EPA to revisit the current levels.

has an "'ongoing' duty to update standards." Maj. Op. 24. However, a statutory obligation to update the soil-lead hazard standards does not require EPA to address the soil standards in the 2019 rulemaking. The majority cannot explain why EPA was required to include soil-lead hazard standards in this rule. As a result, it ignores the standard of review and concludes that EPA violated the TSCA, because the lead-contaminated soil levels are too high, based solely on passage of time and its determination that "there is no safe level of lead in blood." *Id.*

It is important to note that the majority does not conclude that EPA violated the 2017 Writ or that EPA was arbitrary and capricious for not including soil-lead hazard standards in the rulemaking. Rather, the majority jumps to the conclusion that EPA violated the TSCA. *Id.* at 26. Remember, the petition before us only challenges the 2019 rulemaking, limiting our jurisdiction. *See* 15 U.S.C. § 2618(a)(1). If there were no violation of the 2017 Writ, EPA's failure to meet its "statutory obligations" under the TSCA is not properly before us.

## B.  *EPA did not need to address comments outside the scope of its rulemaking.*

EPA did not act arbitrarily or capriciously when it responded to soil-lead related comments in its rulemaking. EPA is not required to address comments outside the scope of the rulemaking. *See Am. Fuel & Petrochemical Manufacturers v. EPA*, 937 F.3d 559, 585 (D.C. Cir. 2019), *cert. denied sub nom. Valero Energy Corp. v. EPA*, 140 S. Ct. 2792 (2020) (agreeing that EPA "correctly dismissed comments" that were "outside the scope" of the rule). To the contrary, the agency is only required to respond to comments

that are "relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule [because they] cast doubt on the reasonableness of a position taken by the agency." *Nat'l Min. Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) (per curiam) (alteration in the original) (quoting *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977). The soil-lead hazard standards are separate and distinct from the DLHS. Thus, EPA did not need to address the comments.

Further, even if the comments were relevant, EPA's regulation is not arbitrary and capricious, unless it "failed to address significant comments raised during the rulemaking." *Ass'n of Priv. Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 441–42 (D.C. Cir. 2012). Here, EPA explained that the comments were outside the scope and required different analyses; nothing more is required. *See Nat'l Min. Ass'n*, 116 F.3d at 549 (explaining that the requirement to respond is not "particularly demanding"). Accordingly, nothing in this record establishes that EPA's decision not to update soil standards in the 2019 rulemaking was arbitrary or capricious.

\* \* \*

The statutory scheme of the TSCA and RLBPHRA authorized EPA to consider both health and nonrisk factors in setting the DLHS. EPA did not act arbitrarily or capriciously in setting those levels. Nor did EPA violate the 2017 Writ in declining to set soil-lead hazard standards. Accordingly, the petition for review should be denied on these grounds.